John Balestriere (JB-3247)
William S. Holleman*
**BALESTRIERE LANZA PLLC**
225 Broadway, Suite 2900
New York, NY 10007
Telephone:    (212) 374-5401
Facsimile:    (212) 208-2613
jbalestriere@balestriere.net
*Attorneys for Plaintiff*



'08 CIV 5166

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

JEREMY S. PITCOCK,

                               Plaintiff,

                - against -

KASOWITZ, BENSON, TORRES &
FRIEDMAN, LLP, ERIC WALLACH, and
SITRICK AND COMPANY,

                     Defendants.

----------------------------------------------------------------- x

Index No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

ECEIVE

JUN 05 2008

Index No. S.D.C. S.D. N.Y.
CASHIERS

        Plaintiff Jeremy S. Pitcock ("Pitcock"), by his attorneys, Balestriere Lanza PLLC,

for his Complaint against Defendants Kasowitz, Benson, Torres & Friedman, LLP ("the

Kasowitz Firm" or "the Firm"), Eric Wallach ("Wallach"), a partner of the Kasowitz

Firm, and Sitrick and Company ("Sitrick") (collectively, "Defendants"), respectfully

alleges as follows upon information and belief, except as to allegations concerning

Pitcock, which are made upon personal knowledge, and except as otherwise indicated:

## PRELIMINARY STATEMENT

1.    The Kasowitz Firm and public relations ("PR") firm Sitrick have destroyed the professional reputation and enormous earning potential of Pitcock, one of the Firm's former partners, by widely disseminating a press release (the "Press Release") which misrepresents that Pitcock was "terminated for cause . . . because of extremely inappropriate personal conduct." Pitcock was not fired for cause, nor had he ever engaged in any "extremely inappropriate personal conduct." The Kasowitz Firm and Sitrick knew that the Press Release, as well as the Firm's other public and private statements, would severely damage Pitcock's reputation. When the Kasowitz Firm smeared him, Pitcock was only 35 years old and was a rising star in intellectual property ("IP") litigation with at least three decades of a satisfying and lucrative legal career ahead of him.

2.    The Firm issued the Press Release in January 2008—and made further statements to the media and even to Pitcock's clients—for two reasons. First, the Kasowitz Firm and Sitrick knew that large law firms and their generally conservative IP clients would not hire Pitcock if it appeared that he had engaged in outrageous sexual misconduct, as the Press Release strongly, yet misleadingly, implied. The Press Release stated that the conduct was not only "extremely inappropriate" but "personal," without details. As the Kasowitz Firm and Sitrick must have known and intended, this deliberate vagueness regarding the "extreme" and "personal" conduct fed an ongoing rumor mill about what this conduct could be—especially given that large law firms and companies often tolerate and keep private inappropriate personal and professional

conduct, and that the Kasowitz Firm actually went to the trouble of hiring Sitrick and issuing the Press Release. This made it impossible for Pitcock to get a job with another large law firm, let alone recruit with him associates from Kasowitz or work with his former clients.

3.      Second, the Kasowitz Firm was angry about the way Pitcock's departure had been reported in one media source—*not* by Pitcock or his new law firm, Morgan & Finnegan, LLP ("Morgan & Finnegan"). This media source reported that Morgan & Finnegan "nabbed" Pitcock from the Kasowitz Firm. Apparently angered by the reporting—which they may have believed could undermine their plan to maintain at their Firm the business Pitcock successfully brought to the Kasowitz Firm—the Firm falsely characterized Pitcock's withdrawal: he was not fired "for cause," and he did not engage in extremely inappropriate conduct, personal or professional.

4.      The Kasowitz Firm stated it only wished "to set the record straight." However, if the Kasowitz Firm sought only to correct what it claims was inaccurate reporting, it simply could have stated that the Firm asked Pitcock to leave by means of an "involuntary withdrawal." Instead, the Firm went out of its way to publicly smear Pitcock in a profession that has only once before seen a firm go to such lengths to disseminate deliberately and widely such negative statements about a former partner. The Firm's intent was to destroy Pitcock's reputation, thus preventing him from taking clients and associates with him to Morgan & Finnegan or to any other firm.

5.      As discussed below, it might have been the Kasowitz Firm's plan to get rid of Pitcock (just as it had done with another IP partner at the Firm) after Pitcock had

brought IP clients to the Firm and recruited staff to develop a substantial IP department. It seems that, once Pitcock achieved these two goals for the Kasowitz Firm, the Firm did not need him as much and used minor misconduct as a pretext for firing him right before he was due substantial end-of-the-year compensation. By asking Pitcock to leave—after the IP department was built and had garnered many clients—the managing partners could retain for themselves the profits from Pitcock's efforts.

6.      If the blogs are right, the Kasowitz Firm has done nothing to help its own reputation by its treatment of Pitcock, but the Firm did achieve its goal of devastating Pitcock's reputation. Pitcock lost his job at Morgan & Finnegan just weeks after the Firm issued the Press Release. Notwithstanding Pitcock's excellent academic and professional credentials, other large firms' interest in Pitcock prior to the Press Release, and Pitcock's extensive efforts to find a new job, Pitcock simply cannot find another suitable legal job.

7.      Before the Firm's defamatory statements, Pitcock was fewer than ten years out of law school, yet he had already developed a substantial book of IP litigation business and was earning more than a million dollars annually, with three decades or more of a promising career ahead of him. Now, he cannot find any law firm employment of the kind that he has trained for since he began studying physics at the Massachusetts Institute of Technology ("MIT") nearly two decades ago. In fact, because only larger, established firms deal with the type of high value, complex, and technical IP litigation that Pitcock handles, Pitcock cannot work as a solo practitioner, in

government, or at a non-profit organization. Despite pursuing every employment avenue open to him for months, Pitcock cannot find any law firm job at all.

8.      Having no alternative, Pitcock is forced to sue his former partners at the Kasowitz Firm and its PR firm for defaming him, conspiring to destroy his reputation, tortiously interfering with one employment contract, interfering with future business relationships with clients and firms, violating his privacy, and breaching their duties to him when he was a partner and as a former partner.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and the parties are citizens of different states. Pitcock is a citizen of New Jersey; the Kasowitz Firm is a New York limited liability partnership with its principal place of business in New York; Wallach is a New York citizen; and Sitrick is a California corporation with offices in California and New York.

10.     This Court has personal jurisdiction over the parties because Pitcock submits to the jurisdiction of this Court; the Kasowitz Firm and Wallach are citizens of New York, do business in New York, and avail themselves of the privileges and protections of the laws of New York; and Sitrick is a California corporation that does business in New York and avails itself of the privileges and protections of the laws of New York.

11.     Venue is properly laid in the Southern District of New York under 28 U.S.C. § 1391(a)(2) because the claims arose in this District.

## PARTIES

12.     Plaintiff Jeremy S. Pitcock is a citizen of New Jersey and resides in Englewood, Bergen County.

13.     Pitcock and his family are very involved in the Englewood community. Pitcock's wife, Grace, and Pitcock's older son attended many local classes in New Jersey. Grace also attends a study group with a northern New Jersey Methodist church and has family, numerous friends, and acquaintances in the community.

14.     The Kasowitz Firm knew that Pitcock lived in New Jersey: his home address was listed in various firm directories, and materials were sent to him at his home during his tenure at the Firm and thereafter.

15.     Pitcock is currently self-employed and works as an IP consultant out of his New Jersey home.

16.     The Kasowitz Firm is a New York registered limited liability partnership and has offices in New York, Atlanta, Houston, Newark, and San Francisco. The Firm is noted for its extremely aggressive approach to litigation and comprises more than 250 attorneys specializing in matters from family law to IP litigation.

17.     Sitrick is a California corporation that purports to offer PR services and operates out of offices in Los Angeles and New York.

18.     Eric Wallach is a senior partner in the Kasowitz Firm and heads the Firm's Employment Practices and Litigation group.

## STATEMENT OF FACTS

### Pitcock's Early and Remarkable Professional Career Growth

19.     Jeremy Pitcock is a well-educated, highly experienced IP attorney who specializes in complex, high financial value patent litigation.

20.     After graduating from MIT in 1994, Pitcock graduated from the University of Pennsylvania Law School in 1998 and thereafter joined the IP practice at Simpson Thacher & Bartlett LLP ("Simpson"), one of the nation's most prominent law firms.

21.     Pitcock excelled at Simpson for more than seven years, working on a variety of complex IP matters, assuming a great deal of responsibility, and establishing himself as one of Simpson's premiere young IP attorneys.

22.     Indeed, Pitcock had developed a stellar reputation in the IP field, as well as a substantial client base, and was even the focus of an article in *The American Lawyer* underscoring the central role of IP attorneys in a profitable law practice. (American Lawyer Article, attached hereto as Exhibit A.)

23.     Given the lucrative and competitive nature of the IP field, Pitcock's accomplishments were exemplary in any case, but especially so because of his young age and status as a mere associate.

### Kasowitz's Recruitment of Pitcock

24.     A few years ago, lured by the promise of substantial profits, the Kasowitz Firm was looking to start and quickly build its IP practice and began targeting talented and reputable attorneys in the field.

25.     In or around February 2006, Salem Katsh, a Kasowitz Firm recent hire, approached Pitcock about joining the Firm. Katsh introduced Pitcock to Marc Kasowitz, the head of the Kasowitz Firm, who offered Pitcock an immediate partnership and guaranteed starting salary of $1.2 million per year, plus significant bonus potential. (Salary Letter, attached hereto as Exhibit B.)

26.     Pitcock accepted the offer and joined the Kasowitz Firm as an equity partner in March of 2006.

27.     The Kasowitz Firm told Pitcock that it wanted Pitcock to bring over the business he developed at Simpson—which he did—and also that the Firm wanted Pitcock to build a full-blown IP practice at the Firm—which he also did.

### Pitcock Develops the IP Practice as Promised

28.      After joining the Kasowitz Firm, Pitcock made an immediate impact, generating new business, and attracting new attorneys to the Firm.

29.     By April 2007, a little more than a year after joining the Firm, Pitcock had successfully developed several new IP matters, including the following large corporate clients for which Pitcock was both the Firm's primary contact and billing partner: JDS Uniphase Corporation, a fiber optics manufacturing and design company; Harmonic Inc., a video systems delivery company; Adelphia Communications Corporation, formerly the fifth-largest cable provider in the United States; Shaklee Corporation, a leading nutritional and green cleaning products company; Euro RSCG, a large global advertising and marketing agency network; and Bridge Associates LLC, a leading turnaround, crisis, and interim management firm.

30.     Pitcock also helped generate large contingency fee matters. He was the primary contact and billing partner for high-potential-return cases, including one for Modern Creative Services Inc. against Dell, Inc. and another for WebXChange against many patent litigation defendants.

31.     Pitcock did more than bring in business. He also helped build a team of IP lawyers, nearly tripling the size of the Firm's IP department. While at the firm, Pitcock hired one partner and one special counsel, and recruited and hired several associates.

32.     Pitcock worked to build a diverse IP litigation team, and recruited to the firm talented women and minority attorneys, two greatly underrepresented groups in the IP field. Indeed, approximately 50% of Pitcock's hires were women, including an attorney who became the only minority female partner and another attorney who is the lone African-American female attorney at the Firm. Apart from enhancing the Firm's culture, this also made the Kasowitz Firm's IP department more attractive to potential clients seeking to hire diverse firms.

33.     When Pitcock started at the Kasowitz Firm, the Firm had a very small IP practice; however, just one year of Pitcock's arrival, the IP practice had grown to more than ten attorneys with a wide range of experience, and was generating millions in annual revenue.

34.     In February 2007, the Firm chose Pitcock to head the IP department. The Firm had pushed out the previous head, Salem Katsh, in June 2006, fewer than three months after Pitcock joined the Firm. By then, the Firm believed that Katsh had already

served his purpose because Katsh recruited Pitcock and another senior partner, Lawrence Goodwin ("Goodwin").

## Conflict with Goodwin

35.    When the Firm promoted Pitcock to head the IP department, he was the youngest of all IP attorneys in the group and was chosen over a number of far more senior attorneys, including Goodwin.

36.    Unfortunately, though perhaps by design, Pitcock's promotion over Goodwin caused enormous conflict within the IP group. Goodwin, who was much older and had decades more experience than Pitcock, was embarrassed that a much younger attorney was chosen to lead the department.

37.    Goodwin and Pitcock were in constant conflict and the two frequently argued about running of the IP department and various other IP matters.

## December 5, 2007, Meeting with Wallach and Marks

38.    As a result of the tension between Pitcock and Goodwin, upon information and belief, by late 2007 several members at the Kasowitz Firm believed that Pitcock planned to abandon the Firm for another large law firm, and that he was sticking around simply to claim his end-of-the-year 2007 bonus.

39.    To avert a potentially disastrous situation at the Kasowitz Firm in which Pitcock could take both business and attorneys with him on his way out, two of the Firm's partners, Wallach and Aaron Marks ("Marks") met with Pitcock on December 5, 2007, on the pretext of discussing Pitcock's supposed "misconduct."

40.    Wallach had previously shown personal animosity towards Pitcock, almost certainly because Pitcock's ex-wife used to be an associate in the Firm's Employment Practices and Litigation Group working under Wallach. Wallach has always been aware that Pitcock knew of allegations of misconduct against him and has always been biased against Pitcock as well as desiring to end the Firm's relationship with Pitcock, preferably in a manner which would insure Pitcock's silence regarding any allegations of misconduct against Wallach.

41.    During the December 5 meeting, Wallach interrogated Pitcock regarding an unfortunate incident from Pitcock's recent past.

42.    In September 2007, Pitcock and an associate from another group at the Firm shared a brief, consensual kiss. The kiss occurred in the associate's apartment after they had been out drinking together with other Firm staff at a bar near the Firm. Pitcock and the associate both realized that they had made a mistake and had no further physical contact. Pitcock believes that this consensual, one-time kiss is what the firm later described as "extremely inappropriate personal conduct" in its Press Release.

43.    Pitcock thereafter had only sporadic, friendly communications with the associate, seeing her perhaps two times at Firm events and sending her no more than a couple of e-mails, including one at the Firm Holiday party a few days before the December 5, 2007, meeting. The associate gave no indication that such friendly interactions were unwanted. Pitcock never had any other such contact with anyone associated with the Firm, either before or after this September 2007 episode.

44.    Given the sensitive nature of this incident, Pitcock discussed this encounter with only Wallach and Marks at the December 5, 2007, meeting in response to Wallach's questions, believing that, as partners with a fiduciary duty to one another, they deserved truthful responses to their questions about a very private matter. Pitcock believed and expected that his partners Wallach and Marks would treat this matter with the utmost discretion and would keep this private matter in confidence.

45.    Wallach interrogated and humiliated Pitcock for at least thirty minutes in an extremely aggressive manner, berating Pitcock for his indiscretion. Pitcock was shocked at Wallach's demeanor and accusations during the interrogation. Pitcock had never been accused of any impropriety prior to the December 5 meeting and, prior to that meeting, had no reason to believe that anyone was unhappy with his job performance or personal conduct.

46.    As the meeting ended, Wallach told Pitcock that he was still a partner in the Firm and that he should conduct himself accordingly. Pitcock apologized to Marc Kasowitz for his behavior by e-mail the next day, December 6, 2007. Marc Kasowitz replied that Pitcock should come see him the day after that.

47.    Pitcock had always gotten along quite well with Marc Kasowitz, and Kasowitz himself assured Pitcock on multiple occasions that Pitcock was doing a great job for the Firm and would receive substantial additional compensation at year's end.

**The Kasowitz Firm Forces Pitcock Out**

48.    On December 7, 2007, two days after the meeting Marks and Wallach, Marc Kasowitz told Pitcock that he was no longer a partner and had to leave the Firm.

49.    Given that Pitcock essentially built the IP practice at the Kasowitz Firm, Pitcock could not believe that his "misconduct"—the September 2007 incident— warranted his involuntary withdrawal, especially in an environment where heavy drinking and other improper conduct appeared to be tolerated.

50.    The Firm terminated Pitcock in early December 2007, using the September 2007 incident as a pretext, to deprive Pitcock of the additional compensation which he would have received at the end of December.

51.    Pitcock was surprised at the decision, but he always understood that Marc Kasowitz had the authority to hire or fire anyone at the Kasowitz Firm. Involuntary withdrawal of partners for no cause is specifically provided for in the partnership agreement of the Kasowitz Firm ("Partnership Agreement"). In fact, Marc Kasowitz had previously discussed in front of Pitcock firing other partners, including Goodwin, on multiple occasions.

52.    Pitcock is unaware of any investigation conducted before the December 7, 2007, meeting. Pitcock certainly was not given a chance to ascertain the reasons for his involuntary withdrawal or even to defend himself against any allegations—he simply had to listen while Wallach berated him in front of Marks. Just as had been the case with Katsh, after the Firm told Pitcock of his involuntary withdrawal, Pitcock was ordered to leave the building and never return.

53.    No one ever told Pitcock that he was "terminated for cause," and no one ever told Pitcock that he had engaged in "extremely inappropriate personal conduct."

**Winding Up Business with the Kasowitz Firm**

54.     Four days after Pitcock learned of his involuntary withdrawal, the Firm sent Pitcock a draft severance agreement on December 11, 2007 (the "Draft Severance Agreement"). (Draft Severance Agreement, attached hereto as Exhibit C.)

55.     The Draft Severance Agreement included a specific provision whereby, if asked, the Kasowitz Firm would state that Pitcock had "resigned for personal reasons," *not* that he was "terminated for cause" *or* for any alleged "extremely inappropriate personal conduct." (Draft Severance Agreement at 7.)

56.     On December 13, 2007, two days after receiving the Draft Severance Agreement, Pitcock sent the Kasowitz Firm his markup of that agreement.

57.     Pitcock never received a response from the Firm.

58.     The Draft Severance Agreement required Pitcock to help "transition" work, and upon information and belief, the Kasowitz Firm wanted to get as much help from Pitcock as possible to keep the business that Pitcock had developed.

59.     Pitcock initially believed that the Kasowitz Firm would negotiate his severance in good faith and, as such, fielded numerous phone calls and e-mails from Firm staff for weeks after Marc Kasowitz told him to leave the Firm on December 7.

60.     However, it is now clear that the Kasowitz Firm never intended to negotiate the severance agreement in good faith, fraudulently inducing Pitcock to continue working with the Firm for no further compensation at a time when Pitcock would have earned his substantial end-of-the-year bonus.

61.     Pitcock even remained on the Kasowitz Firm website in late December 2007, suggesting to the outside world that he was still providing services to the Firm and the Firm's clients.

### Pitcock's Opportunity with Morgan & Finnegan

62.     Meanwhile, Pitcock needed a job. He was supporting his then-pregnant wife and their child, and, as a relatively young if established lawyer, he was determined to continue to build his career. Pitcock interviewed with large law firms to do the highly specialized work he had been training to do for nearly two decades. After negotiating offers from reputable firms—each offering guaranteed starting annual salaries of around one million dollars with the ability to earn far more over time, particularly if he brought business to those firms—Pitcock ultimately decided to join Morgan & Finnegan, a firm known for focusing on IP litigation.

63.     Even though Pitcock did not begin searching for opportunities until after the December 7, 2007, meeting with Marc Kasowitz, Pitcock was able to rely on his excellent reputation to find quickly other employment opportunities using a recruiter.

64.     Pitcock wanted to move on with his life and his career, so on January 2, 2008, about three weeks after he had sent to Marks his proposed edits for the Draft Severance Agreement, Pitcock informed the Kasowitz Firm that he had joined Morgan & Finnegan as an equity partner.

65.     Based on his new employment contract, Pitcock's equity partnership at Morgan & Finnegan was estimated to be worth in excess of $950,000 per year.

66.     Under his new contract Pitcock would earn even more when he generated IP business for his new firm, as he had done at both Simpson and the Kasowitz Firm. Pitcock had developed his own book of business from clients he knew and serviced for years, and hoped that some would want to engage him and his new team at Morgan & Finnegan.

67.     On January 7, 2008, Morgan & Finnegan announced Pitcock's arrival, touting Pitcock as "an outstanding addition to [its] successful litigation practice." (Morgan & Finnegan Release, attached hereto as Exhibit D.) Neither Morgan & Finnegan nor Pitcock said anything disparaging about the Kasowitz Firm.

68.     Because Pitcock had an established reputation in the hot field of IP litigation, the legal media picked up on Morgan & Finnegan's announcement and reported the move.

69.     On January 15, 2008, one legal website reported Pitcock's new employment with the headline, "Morgan & Finnegan Nabs Kasowitz Benson IP Leader." (IP Law360 Article, attached herein as Exhibit E.) The article described Pitcock as "jumping ship" to Morgan & Finnegan, yet neither Pitcock nor Morgan & Finnegan used the terms "nab" or "jumping ship." (*Id.*) Indeed, such words were chosen by IP Law360.

70.     As sophisticated parties such as the partners of the Kasowitz Firm must have known, these stock phrases—"nab" or "jump ship"—are commonly used by legal media to describe the lateral moves of partners, not to soil the image of a former firm.

## The Smear Campaign: the Public Statements

71.    This lone press statement by IP Law360 angered and alarmed the Kasowitz Firm. Because Pitcock had taken business with him from Simpson to the Kasowitz Firm and had been primarily responsible for rainmaking and IP client interactions at the Kasowitz Firm, the partners at the Kasowitz Firm knew that Pitcock could bring clients with him to Morgan & Finnegan.

72.    The Firm made an almost unprecedented move and hired its PR firm, Sitrick, to engage in what has been an extraordinarily successful negative public relations campaign. As a result of the Firm's public and private statements, Pitcock's reputation has been destroyed: it has since become impossible for him to get a job at a large law firm, let alone recruit a team to a new firm or get business at a new firm. Without the resources and support provided by a large firm, Pitcock is not a threat to the Kasowitz Firm—he can neither take clients with him as a solo practitioner nor hire associates with a greatly reduced income.

73.    Given Pitcock's exemplary track record at the Kasowitz Firm before the December 5, 2007, meeting, the Kasowitz Firm could not protect itself by spreading the truth. Instead, in order to retain the clients Pitcock brought to the Firm as well as the staff he had recruited, the Kasowitz Firm was forced to circulate false and misleading statements about Pitcock's departure.

74.    On Friday, January 18, 2008, the Kasowitz Firm and Sitrick widely issued the following Press Release:

Kasowitz, Benson, Torres and Friedman LLP., made the following statement today:

Recent news items have reported, following a news release by a law firm, Morgan & Finnegan, that Jeremy Pitcock left Kasowitz, Benson, Torres and Friedman LLP., to join that firm. Some news items incorrectly reported that Mr. Pitcock had 'defected' or 'jumped ship.'

The fact is that Mr. Pitcock was terminated for cause by our firm in December, 2007, because of extremely inappropriate personal conduct. We were not looking to publicize this incident, but because of those incorrect news items, we feel compelled to set the record straight.

For more information contact Seth Faison, Sitrick and Company, 212-573-6100.

(Press Release, attached hereto as Exhibit F.)

75.    These statements were false: the Kasowitz Firm never told Pitcock that he had been "terminated for cause." Rather, the Firm told him that his departure would be mutually amicable and that both parties, if asked, would say that he "resigned for personal reasons." Furthermore, Pitcock did not engage in any behavior that could be characterized as "extremely inappropriate personal conduct."

76.    The Kasowitz Firm continued its smear campaign, spreading injurious falsehoods almost immediately after the Martin Luther King Holiday weekend that followed the Press Release. One business day later, on Tuesday, January 22, 2008, legal media giant *The American Lawyer* published an article regarding the Press Release. In this article, Wallach is quoted as stating that "Pitcock was terminated Dec. 7 following a 'thorough,' weeklong investigation into reported inappropriate conduct, which the firm

would not describe. . . . The firm's action was consistent with its zero-tolerance policy for such misconduct." (January 22, 2008, Article at 2, attached hereto as Exhibit G.)

77. Notwithstanding Wallach's statements, Pitcock is unaware of any investigation, let alone a "thorough" one, into his conduct, and he has had no opportunity to defend himself against specific allegations. Moreover, the statements about the Firm's "zero-tolerance . . . for such misconduct" are also false because other partners at the Firm have engaged in conduct at least as bad and, arguably, far worse than Pitcock's September 2007 incident without fear of termination. As with the Press Release, Wallach's lies had no purpose but to destroy Pitcock's reputation, making him unmarketable in the reputation-sensitive big firm legal market, and no threat to the business of the Kasowitz Firm.

78. However, other parts of Wallach's statement appear to be an unsuccessful attempt to pull back from what the Firm and Wallach must have known was baseless and inflammatory language in the Press Release. The initial reference to "termination for cause" in the Kasowitz Firm's press statement was changed to mere "termination," which is still wrong, as Pitcock had left by involuntary withdrawal. The "extremely inappropriate conduct" was changed to merely "reported inappropriate conduct," though still without description or clarification, thus fueling to this day the rumors about Pitcock's conduct.

79. Inexperienced in dealing with the press, and having just spent the weekend with his wife in the hospital after the birth of his second son, Pitcock declined to respond to the Firm's incendiary allegations. Heeding the advice of others who said

that the best way to maintain his reputation was to take the high ground, Pitcock revealed nothing about what he considered a private matter that had nothing to do with his business or professional life.

80.    The press statements by Kasowitz and Sitrick were almost certainly vague by design. The Press Release refers to extreme "personal" conduct, leading readers—including law firm partners and general counsel at companies—to believe that Pitcock engaged in some kind of sexually deviant or extreme sexual misconduct that would shock the conscience even of litigators at a firm known for its tough and hard-nosed litigation methods.

81.    This vagueness—combined with the reality that many large firms tolerate high levels of genuinely inappropriate conduct—unleashed a torrent of rumors on blogs and in the legal media. (Rumor Communications, attached hereto as Exhibit H.)

82.    This terrible press has not only destroyed Pitcock's reputation, but it has humiliated him and his family.

83.    The Kasowitz Firm's inaction in the months after Morgan & Finnegan withdrew its offer of partnership to Pitcock proves the malice of its earlier actions. Since issuing its Press Release, the Firm has done nothing to correct the specious speculation about Pitcock's alleged inappropriate conduct, and in fact only exacerbated the situation when Wallach followed up with his own misrepresentations.

### The Smear Campaign: the Private Statements

84.    The Firm has coordinated its public smear campaign with private misrepresentations to the clients that Pitcock used to represent.

- 20 -

85.    Goodwin and other individuals at the Kasowitz Firm have defamed Pitcock to various Firm clients to discourage clients from following him to his new firm.

86.    This defamation is consistent with the Kasowitz Firm's silence: the Firm cannot privately destroy Pitcock's reputation while publicly "clarifying the record." These private statements also advance the Kasowitz Firm's goal: to keep the clients and staff Pitcock brought to the Firm while making it impossible for him to get a job at another Firm where he would be a threat to the Kasowitz Firm.

**The Smear Campaign Succeeds in Destroying Pitcock's Reputation**

87.    Things unraveled quickly for Pitcock. By early February 2008, only a few weeks after the Firm issued the Press Release and Wallach followed up with his defamatory statements, the Sitrick media assault was well under way. This press and media blitz caused Morgan & Finnegan to oust Pitcock despite their preexisting contract. Pitcock learned that he had been voted out of his new partnership via a secret partnership meeting to which Pitcock was not invited. Absent the various malicious and defamatory statements by the Kasowitz Firm and Sitrick, as well as the succeeding media storm, Pitcock would still be a partner at Morgan & Finnegan.

88.    Currently, no other firms will hire Pitcock. Ever since Morgan & Finnegan withdrew its offer of partnership almost four months ago, Pitcock has spent nearly all of his free time looking for a law firm job.

89.    Unfortunately, the law firm partners tell Pitcock that they simply cannot hire him due to the negative press that they would receive.

90.     These firms fear that clients and attorneys looking to join their ranks will believe that the truth *must* be terrible if the Kasowitz Firm went so far as to issue a Press Release in the first place and thereafter remain silent amid the rumors and blogs. The Kasowitz Firm previously has tried to control the "spin" on blogs concerning other Firm matters by encouraging associates to post anonymously (most of the postings in Pitcock's case have been anonymous), and the Firm and Sitrick are attempting the same with respect to Pitcock. Sitrick has also sought to "spin" stories by using anonymous blogging in previous, non-Firm matters.

91.     The Kasowitz Firm succeeded in its smear campaign: Pitcock's inability to find a large law firm job is entirely due to the Kasowitz Firm's, Wallach's, and Sitrick's malicious and defamatory statements.

92.     The Kasowitz Firm's conduct has had a devastating effect on Pitcock and his family, both personally and financially, yet Pitcock initially did not want to resort to litigation. Pitcock tried to resolve this matter at all times in an amicable manner and has tried for months to get a job with a large law firm.

93.     However, there are no offers from large law firms. Pitcock performs some IP related consulting work, but earns a small fraction of what he once did, and the consulting work could end at any time. Kasowitz has successfully destroyed Pitcock's reputation and once highly promising career.

## CLAIMS AGAINST THE KASOWITZ FIRM AND WALLACH

### FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

94.    Pitcock repeats and realleges paragraphs 1 through 93 above as though fully set forth herein.

95.    As a partner of the firm, the Kasowitz Firm's partners owed Pitcock a fiduciary duty.

96.    The Kasowitz Firm's partners breached their fiduciary duty to Pitcock by conducting an unfair and incomplete investigation of Pitcock and by acting on the unsupported findings from this investigation.  The Kasowitz Firm's partners breached their fiduciary duty to Pitcock by refusing Pitcock the chance to respond to complaints or statements concerning any alleged misconduct in order to resolve any factual dispute contributing to Pitcock's involuntary withdrawal or standing with the Firm.

97.    The Kasowitz Firm's partners breached their fiduciary duty to Pitcock by failing to maintain the confidentiality of certain information disclosed by Pitcock to fellow partners, information which was disclosed pursuant to an implicit understanding of trust and confidence arising out of their status as partners.

98.    The breach of those duties has caused significant harm to Pitcock.

### SECOND CAUSE OF ACTION

**(Breach of the Duty of Good Faith and Fair Dealing)**

99.    Pitcock repeats and realleges paragraphs 1 through 98 above as though fully set forth herein.

100.    The Kasowitz Firm, including Wallach, and Pitcock entered into the Partnership Agreement whereby, among other things, each agreed to exercise good faith dealing with one another throughout the relationship.

101.    The Kasowitz Firm and Wallach breached this duty by failing to exercise good faith and fair dealing in investigating Pitcock's conduct, depicting the circumstances surrounding Pitcock's departure, terminating Pitcock, and winding up its business with Pitcock, including its refusal to negotiate in good faith the Draft Severance Agreement.

102.    As a result of the Kasowitz Firm's and Wallach's breach, Pitcock was severely damaged.

<u>**THIRD CAUSE OF ACTION**</u>

**(Breach of Contract as to Partnership Agreement on Post-Termination Payments)**

103.    Pitcock repeats and realleges paragraphs 1 through 102 above as though fully set forth herein.

104.    In or around March of 2006, Pitcock entered into a Partnership Agreement with the Kasowitz Firm. The Partnership Agreement made Pitcock an equity partner at the firm.

105.    A key element of the Partnership Agreement deals with a partner's rights upon termination of partnership interest, particularly rights related to post-termination payment.

106.    The Partnership Agreement outlines both the payment structure for partners who withdraw from the partnership involuntarily and the rules of the termination process.

107.    Under the Partnership Agreement, a Partner is to receive the value of the Partner's interest in Partnership capital (the Partner's capital account balance as of December 31 of the year preceding termination of interest; plus any contributions or additions to capital made by the Partner since December 31 of the year preceding termination of interest; less any returns of capital made to the partner or other capital account reductions since December 31 of the year preceding termination of Interest); plus the value of the Partner's Points interest in undistributed net profits for the year to be dispersed within ninety days of the close of that year; plus Any other amount owed to the Partner.

108.    The Managing Partner and the Executive Committee may award additional amounts upon their discretion, presumably the $60,000 severance pay found in the Draft Severance Agreement. (Draft Severance Agreement at 1.)

109.    Under the Terms of the Partnership Agreement, involuntary withdrawal takes effect upon written notice to the partner or upon such other date as may be specified by the written notice.

110.    The Draft Severance Agreement lists the "effective date" of involuntary withdrawal as December 7, 2007. (Draft Severance Agreement at 1.)

111.    The Draft Severance Agreement might have never become effective due to Pitcock's modifications, but the Partnership Agreement did. And the Draft Severance

Agreement, while perhaps not a contract, constituted notice of involuntary withdrawal sufficient to trigger the Firm's obligations under the Partnership Agreement.

112.    Pitcock has done all of the things that the Firm has required of him; however, the Firm has failed to abide by key elements of the Partnership Agreement.

113.    The Firm's failure to pay Pitcock as promised constitutes a material breach of their Partnership Agreement. Furthermore, the Firm's failure to notify Pitcock of the special meeting to determine withdrawal constitutes improper exclusion based on fiduciary duty, the punctilio of honor, and the express terms of the Partnership Agreement.

114.    Pitcock expected to receive approximately $400,000 in post-termination payments; this does not include additional monies for goodwill distribution, compensation for his promotion to head of a department, or the contingency fee matters he brought to the Firm. Pitcock also expected the Firm to return his $80,000 capital contribution and to pay at least $60,000 in severance payments. As a result of the Firm's bad faith conduct, Pitcock has incurred and will incur substantial attorney's fees.

### FOURTH CAUSE OF ACTION

**(Fraudulent Inducement)**

115.    Pitcock repeats and realleges paragraphs 1 through 114 above as though fully set forth herein.

116.    On or about December 11, 2007, Pitcock received the Draft Severance Agreement as notice of his involuntary withdrawal. (Draft Severance Agreement.)

117.    This agreement was designed to induce Pitcock to continue working for the Kasowitz Firm.

118.    It required Pitcock's "cooperation in transitioning any matters he was working on as of the Effective Date." (Draft Severance Agreement at 1.)

119.    In return, Pitcock was entitled to severance pay and "neutral reference," meaning the firm would respond to any inquiries about Pitcock's departure "by stating that Pitcock resigned for personal reasons." (Draft Severance Agreement at 7.) While Pitcock's conduct was not "extremely inappropriate," it was embarrassing to him and his family; thus the confidentiality element of the Draft Severance Agreement was very important to Pitcock.

120.    Two days after receiving the Draft Severance Agreement, Pitcock returned his markup of that agreement.

121.    Acting in good faith, Pitcock continued to transition the work for the Kasowitz Firm for weeks, despite the Firm's silence on his markup of the Draft Severance Agreement.

122.    On or about January 2, 2008, Pitcock informed the Kasowitz Firm that he joined Morgan & Finnegan as an equity partner.

123.    On or about January 18, 2008, the Defendants issued the defamatory Press Release, which falsely characterized Pitcock's departure from the firm, not as resignation for personal reasons as the Firm suggested in its attempt to induce Pitcock to continue his work for the firm, but as termination for cause, and alleged "extremely inappropriate personal conduct."

124.    Defendants fraudulently misrepresented their intent to negotiate a severance agreement in good faith. They did so in order to retain Pitcock's services for free, without the responsibility to pay his substantial end-or-the-year bonus.

125.    In response to press inquiries about the situation surround his withdrawal from the Kasowitz Firm, Pitcock abided by the terms of the Draft Severance Agreement, refusing to comment but to say that he left for personal and not professional reasons. Pitcock did not defame the Firm and maintained strict confidentiality even after the Firm's defamatory Press Release.

126.    Instead, the Kasowitz Firm encouraged wide dissemination of the statements throughout the legal and business community by way of Wallach's public announcement and the Firm's subsequent comments on several websites.

127.    The Kasowitz Firm fraudulently misrepresented its intention to negotiate with Pitcock, which induced him to continue to work for Kasowitz for weeks in reliance on Kasowitz's misrepresentations.

128.    The Firm is liable for the harm caused by his justified reliance.

## FIFTH CAUSE OF ACTION

### (Unjust Enrichment)

129.    Pitcock repeats and realleges paragraphs 1 through 128 above as though fully set forth herein.

130.    Pitcock conferred benefits onto the Kasowitz Firm by bringing new clients and contingency fee matters to the Firm.

131.    It is unjust for the Kasowitz Firm to retain this benefit because the Firm did not earn these benefits, as it was Pitcock who generated all of this business. Moreover, the Firm unjustly and intentionally drove Pitcock out by way of an incomplete and unfair investigation and soiled his reputation by spreading false and misleading statements about his departure.

### SIXTH CAUSE OF ACTION

### (Unfair Competition)

132.    Pitcock repeats and realleges paragraphs 1 through 131 above as though fully set forth herein.

133.    The Kasowitz Firm misappropriated Pitcock's skill and labor by fraudulently inducing him to join the Firm as a partner.

134.    This was done in bad faith and for the Firm's own commercial advantage, as the Kasowitz Firm planned to oust Pitcock after he had attracted substantial business to the Firm, recruited a number of exceptional attorneys, and almost single-handedly transformed the Firm's IP department into a reputable practice.

135.    The Kasowitz Firm further misappropriated Pitcock's skill and labor by fraudulently inducing him to continue to work for the firm after the Firm terminated Pitcock. Moreover, for three weeks after his involuntary withdrawal, the Firm represented to the outside world, through its website and by making his services available, that he was still a member of the Firm.

136.    This was also done in bad faith and for the Firm's own commercial advantage. The Kasowitz Firm needed Pitcock to ease the transition and did not want

lose any clients, yet the Firm knew all to well that it would not negotiate the Draft Severance Agreement in good faith.

## CLAIMS AGAINST ALL DEFENDANTS

### SIXTH CAUSE OF ACTION

### (Conspiracy)

137.　Pitcock repeats and realleges paragraphs 1 through 136 above as though fully set forth herein.

138.　Around January 2008, the Firm and Sitrick conspired unlawfully to defame Pitcock and to perpetrate other tortious behavior in order to retain Pitcock's IP clients and associates and otherwise benefit themselves.

139.　The Firm hired a PR firm, Defendant Sitrick, to issue the Press Release, which was widely disseminated throughout the legal community, and which falsely characterized Pitcock's departure from the Firm as termination for cause, alleging "extremely inappropriate personal conduct."

140.　Defendant Wallach reinforced these false statements on January 23, 2008, through an article published in *The American Lawyer*.

141.　The Firm and Sitrick subsequently encouraged wide dissemination of the statements throughout the legal and business community by posting comments on several websites designed to engender intense and false speculation about what Pitcock had done.

142.　The false, defamatory statements published by the Defendants injured Pitcock's reputation; caused Pitcock severe emotional distress, humiliation, and

embarrassment; and continue to injure Pitcock in his good name, reputation and business and caused special damages in the form of lost income.

**SEVENTH CAUSE OF ACTION**

**(Tortious Interference with Contract)**

143.    Pitcock repeats and realleges paragraphs 1 through 142 above as though fully set forth herein.

144.    Pitcock entered into a contract with Morgan & Finnegan whereby Pitcock agreed to join Morgan & Finnegan as a partner in its IP practice group.

145.    The Kasowitz Firm knew about this contract with Morgan & Finnegan.

146.    The Kasowitz Firm sought to interfere with this contract out of fear that Pitcock would take clients from the Kasowitz Firm over to Morgan & Finnegan, thus costing the Kasowitz Firm millions of dollars in lost future business.

147.    The Kasowitz Firm and Wallach made various malicious statements about Pitcock, as described above, without justification or privilege, intending these statements to cause Morgan & Finnegan to renege on its partnership agreement with Pitcock.

148.    These malicious statements caused enormous damage to Pitcock.

**EIGHTH CAUSE OF ACTION**

**(Tortious Interference with Business Relationships)**

149.    Pitcock repeats and realleges paragraphs 1 through 148 above as though fully set forth herein.

150.    After being terminated by the Kasowitz Firm, Pitcock entered into a business relationship with Morgan & Finnegan.

151.    After the Kasowitz Firm learned of this relationship, the Firm sought to destroy this relationship as well as the relationships that Pitcock had formed with many of his clients.

152.    In the weeks that followed Pitcock's departure from the Firm, Defendants proceeded to disseminate false and misleading statements about Pitcock, statements which were intended to cause others to sever their relationships with Pitcock.

153.    As a result, Morgan & Finnegan withdrew its offer of partnership, costing Pitcock many millions of dollars.

## NINTH CAUSE OF ACTION

### (Tortious Interference with Prospective Employment or Advantage)

154.    Pitcock repeats and realleges paragraphs 1 through 153 above as though fully set forth herein.

155.    Prior to commission of the acts by the Defendants, Pitcock was reputed, esteemed, and sought after in the legal community.

156.    On or about January 18, 2008, Defendants sought to interfere with Pitcock's prospective employment in order to protect their recently acquired IP department and retain Pitcock's clients.

157.    The firm hired a PR firm, Defendant Sitrick, to issue a press release January 18, 2008, which was widely disseminated throughout the legal community and which falsely characterized Pitcock's departure from the Firm, alleging "extremely

inappropriate personal conduct" and falsely claiming that Pitcock was "terminated for cause."

158.    The Press Release was intended to imply deviant sexual behavior but was in every way false, misleading, defamatory, libelous, unprivileged, and without legal excuse.

159.    Defendant Wallach reinforced the false statements on January 23, 2008, through an article he published in *The American Lawyer*.

160.    The Defendants subsequently encouraged wide dissemination of the statements throughout the legal and business community by posting comments on several websites designed to engender intense and false speculation about what Pitcock had done.

161.    The false, defamatory statements published by the Defendants injured Plaintiff's reputation, caused severe emotional distress, humiliation, and embarrassment, continue to injure Plaintiff in his good name, reputation and business and caused special damages in the form of lost income.

162.    Moreover, after the Firm spread misleading statements to many of Pitcock's clients, those clients wanted nothing more to do with Pitcock, believing the Firm's false and misleading statements. This lost client base cost and will continue to cost Pitcock many millions of dollars.

163.    The Firm's statements to Pitcock's clients also violated American Bar Association and New York State Bar Association ethical guidelines by engaging in dishonest and deceitful behavior, which additionally impinged on the clients' right to

choose counsel by deceitfully slanting the choice between remaining at the Firm and following Pitcock to his new firm.

## TENTH CAUSE OF ACTION

### (Defamation and Defamation *Per Se*)

164.    Pitcock repeats and realleges paragraphs 1 through 163 above as though fully set forth herein.

165.    Defendants made numerous misrepresentations regarding the underlying reasons for and means of Pitcock's departure in both its Press Release and subsequent comments found in several articles.

166.    These statements clearly identified Pitcock, referencing him by name.

167.    These statements were false, as they inaccurately misrepresented the events in question and were unsupported by the facts.

168.    The various statements made by Defendants were defamatory as they greatly exaggerated the conduct of Pitcock and were designed to engender intense and false speculation about what Pitcock had done.

169.    Defendants made these statements either intentionally or with reckless disregard for the truth.

170.    These statements severely damaged Pitcock by causing great harm to his reputation, both publicly and privately.

## ELEVENTH CAUSE OF ACTION

### (Injurious Falsehood)

171.    Pitcock repeats and realleges paragraphs 1 through 170 above as though fully set forth herein.

172.    In or around January 2008 and soon thereafter Defendants published injurious falsehoods to disparage Pitcock's integrity and damage his legal career.

173.    On or about January 18, 2008, the Defendants issued the defamatory Press Release, which was widely disseminated throughout the legal community and which falsely characterized Pitcock's departure from the Firm as being termination for cause, alleging "extremely inappropriate personal conduct."

174.    The statements intentionally implied that Pitcock engaged in deviant sexual behavior, a charge which is false, misleading, defamatory, libelous, unprivileged, and without legal excuse.

175.    Defendant Wallach reinforced these false statements on January 23, 2008, in an article published in *The American Lawyer*.

176.    The Defendants subsequently encouraged wide dissemination of the statements throughout the legal and business community by posting comments on several websites designed to engender intense and false speculation about what Pitcock had done.

177.    The false, defamatory statements published by the Defendants injured Pitcock's reputation, caused severe emotional distress, humiliation, and embarrassment,

continue to injure Pitcock in his good name, reputation and business and caused special damages in the form of lost income.

## TWELFTH CAUSE OF ACTION

### (False Light Invasion of Privacy)

178.    Pitcock repeats and realleges paragraphs 1 through 177 above as though fully set forth herein.

179.    In making and disseminating remarks about Pitcock's departure and the kiss in September 2007, Defendants' gave publicity to a matter concerning Pitcock that placed Pitcock before the public in a false light.

180.    The Firm's statements placed Pitcock in a false light. By saying that Pitcock was "terminated for cause" for "extremely inappropriate personal conduct," particularly given its knowledge of the conduct far worse than Pitcock's that goes unpunished in the legal community, the Firm insinuated that Pitcock engaged in outrageous conduct that was beyond the pale.

181.    Defendants' purposefully inaccurate portrayal of Pitcock as a professional who conducts himself in an extremely inappropriate manner is offensive.

182.    Defendants knew that they would be portraying Pitcock in a false light when making these statements.

183.    As a result of the Defendants' actions, Pitcock has suffered irreparable damage to his professional and personal reputation.

## THIRTEENTH CAUSE OF ACTION

### (Public Disclosure of Private Facts)

184.    Pitcock repeats and realleges paragraphs 1 through 183 above as though fully set forth herein.

185.    Defendants publicly disclosed matters regarding Pitcock's termination and personal life that would be offensive to the reasonable person.

186.    These matters were not of public concern.

187.    Pitcock has suffered injury as a result of the Defendants' disclosure.

## PRAYER FOR RELIEF

**WHEREFORE**, Pitcock prays for the following relief:

A.      Compensatory damages in the amount of no less than $540,000 for breach of contract, plus interest, for which the Kasowitz Firm is liable;

B.      Compensatory damages in the amount of no less than $30 million, plus interest, for injury to reputation resulting in loss of current and prospective income; emotional distress, humiliation, and embarrassment; loss in billable time; and out-of-pocket expense resulting from his attempts to clear his name, for which the Defendants are jointly and severally liable;

C.      Special damages in the amount of no less than $28.5 million, plus interest, for lost income as a result of the Defendants' tortious interference with his contract with Morgan & Finnegan, for which the Defendants are jointly and severally liable;

D.      Punitive damages in an amount of no less than $60 million, plus interest, for the wanton, malicious, and intentional nature of Defendants' conduct, punitive damages to deter the Defendants from further misconduct;

E.      An Order from this Court that the Kasowitz Firm and Sitrick retract all defamatory statements, issue a release affirmatively stating that Pitcock was not terminated for cause and that earlier statements were false and misleading, and refrain from making any further misleading or defamatory statements or doing anything else which would interfere with Pitcock's present or future business relationships; and

F.      Any other such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury for all issues so triable in this action.

Dated:New York, New York                    Respectfully submitted,
     June 5, 2008

                              John Balestriere (JB-3247)
                              William S. Holleman*
                              **BALESTRIERE LANZA PLLC**
                              225 Broadway, Suite 2900
                              New York, NY 10007
                              Telephone:   (212) 374-5401
                              Facsimile:   (212) 208-2613
                              jbalestriere@balestriere.net
                              *Attorneys for Plaintiff*

---

* Admission pending to the New York State Bar.

# Exhibit A



Stay Connected with LAW.COM'S FREE E-Newsletters!
Register for 1, 2, 3 or as many as yourself, they're ALL FREE!!

# LAW.COM

Select 'Print' in your browser menu to print this document.

**Copyright 2007 ALM Properties, Inc. All rights reserved.**

Page printed from: http://www.law.com

Back to Article

---

## IP Litigators: Worth Their Weight in Gold?

By Brenda Sandburg
The American Lawyer
03-15-2007



As a senior patent litigation associate at Simpson Thacher & Bartlett, Jeremy Pitcock was wooed by firms offering partnerships, $75,000 signing bonuses and, on top of his partner paycheck, 5 percent of any business he helped generate.

"I was getting calls from recruiters all the time," Pitcock says.

By the time he was a sixth-year associate, he was offered his first partnership. He turned it down, waiting for the firm with just the right mix of reputation and resources.

Last March, Pitcock, then an eighth-year associate at Simpson, found his match. He jumped to Kasowitz, Benson, Torres & Friedman -- the first time ever that Kasowitz has made a partner of an associate from another firm. Kasowitz won't say what Kasowitz did to sweeten the pot, but he clearly won't be hurting for money. Average profits per partner at Kasowitz were $1.5 million in 2005.



Pitcock's move is already paying off for Kasowitz. He had been working on a patent case for JDS Uniphase Corp. and brought it with him. The company then chose Kasowitz over Simpson in a beauty contest for a patent infringement suit against Litton Industries, Inc.

Patent litigators are a must-have item for firms. And they're willing to pay for them -- even if, as in Pitcock's case, they have a moderate book of business and just a couple of trials under their belt. Constantly changing technology, consolidation of industries and the increasingly cross-border nature of IP battles are expanding the size and scope of patent cases. The median cost to take a patent case through trial in 2005 was in the $5 million to $6 million range, up from $2 million in 1995, according to the American Intellectual Property Law Association. All of which means that firms are missing a potential fee bonanza if they don't have enough

lawyers on hand to do the work.

"If I could hire five or six lawyers today, I would in a second," says Claude Stern, co-chair of Quinn Emanuel Urquhart Oliver & Hedges's IP group. "We're really scraping." (On average, 60 percent of Quinn Emanuel's revenue has come from IP work over the last five years, Stern says, and half of that has been patent litigation. Since Quinn had gross revenue of $298 million in 2006, its patent litigation income for the year was around $89 million.)

Stern and others looking to hire should start adding zeros to their checks. The rate for talent with a decent book of business can run upward of $1.8 million, with top rainmakers commanding $5 million and up, recruiters and partners say. Be prepared to toss in a signing bonus, too.

"It's a hot area because there's such a shortage [of lawyers]," says San Francisco Bay area recruiter Gary Davis.

The shortage isn't a new phenomenon. Patent litigation has been hot for years, and lawyers like William Lee of Wilmer Cutler Pickering Hale and Dorr, Morgan Chu of Irell & Manella and Matthew Powers of Weil, Gotshal & Manges became bona fide litigation superstars before "Internet" was a household word.

But several factors are working against firms trying to build a big patent litigation practice. Law schools pump out only a handful of graduates each year with the technical backgrounds necessary for patent law. Even with that background, it takes years to acquire the basic skills needed to run a patent case. And there's fierce competition among firms for the few with that talent.

"You can't practice IP for five years and say, 'I've got it,'" says M. Patricia Thayer, co-chair of Heller Ehrman's 80-lawyer IP litigation practice. "It is a profoundly difficult subject area that requires knowledge of esoteric areas of law and technology and the ability to try a case and talk to a judge."

Considering some of the amounts at stake in several recent patent cases, firms may want to consider sending lawyers back for a science degree. Among the top patent verdicts of 2006 were Hynix Semiconductor Inc.'s $306.9 million award in a case against Rambus Inc. (Daniel Furniss of Townsend and Townsend and Crew was lead counsel for Hynix, and Gregory Stone of Munger Tolles was lead for Rambus; the award was subsequently reduced to $130 million by the judge); z4 Technologies, Inc.'s $133 million victory in its battle against Microsoft Corp. and Autodesk, Inc. (Ernie Brooks of Brooks Kushman represented z4, and John Gartman of Fish & Richardson represented Microsoft and Autodesk); and Tivo Inc.'s $74 million award in a fight with Echostar Communications Corp. (Irell & Manella's Chu represented Tivo, and Morrison & Foerster's Harold McElhinney represented Echostar).

"There's no end in sight," Stern says, "We're in a technological era of remarkable invention and market consolidation. Given the confluence of these factors, I can't see how IP in copyright, trademark and patents will diminish."

In 2001 Medinol Ltd., an Israeli company that manufactures coronary stents, sued Boston Scientific Corp., claiming theft of its stent technology. The company hired Cravath, Swaine & Moore -- not your typical IP player -- to handle the case. By September 2005, Boston Scientific had paid Medinol $750 million to settle the case, and a loyal Cravath client was born. (Partner Rory Millson led the case for Cravath.) Cravath has since handled another major Medinol patent suit against Guidant Corp., as well as several other litigation matters. Cravath has found one of the advantages of patent litigation: It can throw off a good deal of additional IP work. Companies invest a lot of time in educating outside counsel about their technology, so if they are successful in one case they are likely to get hired for future patent cases. Such familiarity with the company's technology "is one of the considerations for which firm we select," says Tom Burt, Microsoft's deputy general counsel for litigation.

The fact that Cravath appeared in the middle of a patent case also signals that elite Wall Street firms are tuning in to IP. That's a far cry from a decade ago when such cases were almost exclusively the province of boutiques and a few forward-thinking general practice firms like Morrison & Foerster and Heller. Cravath continues to score. Partners Evan Chesler, Richard Stark and David Greenwald are leading a case for Bristol-Myers Squibb Co. and Sanofi-Aventis against Apotex Inc. over its generic version of the heart drug Plavix, which had sales of nearly $6 billion in 2005.

But firms with little experience in patent and other IP matters should be careful. As *The American Lawyer*'s sibling publication *IP Law & Business* reported last June, some of New York's leading dealmakers -- including Shearman & Sterling and Davis Polk & Wardwell -- have had trouble hiring and keeping patent litigation laterals. They aren't alone. Morgan, Lewis & Bockius had trouble keeping litigators after it acquired the 35-lawyer New York patent boutique Hopgood Calimafde Judlowe & Mondolino in 2001. At least 30 members of the group left the firm in 2005, in part because the Hopgood group was placed in the litigation practice rather than the IP practice, and turf wars developed. Partner Craig Opperman says Morgan "has learned whatever lessons there were to learn" from the Hopgood group's

departure. The firm has since tweaked its firmwide management for IP lawyers. Last year Morgan Lewis bolstered its IP ranks somewhat with the acquisition of 10 lawyers from Dorsey & Whitney after Dorsey closed its San Francisco office. The group, primarily patent prosecutors, had previously been with the patent boutique Flehr Hohbach Test Albritton & Herbert, which merged with Dorsey in 2002.

"There is a real challenge finding the right people and getting them to move," says Morgan Lewis patent litigation partner Craig Opperman. Opperman, who had been at Cooley Godward before becoming general counsel of OpenTV Corp., joined Morgan Lewis in 2004. The following year the firm recruited Daniel Johnson from Fenwick & West and David Bohrer from Dechert.

Keeping a patent litigator happy is not necessarily an easy task. Leora Ben-Ami, a rainmaker who jumped from Clifford Chance to Kaye Scholer in 2003, says she "wanted to go to a firm that understood what patent litigation was all about. A lot of general practice firms consider it to be like any litigation." Ben-Ami's jump coincided with a period when partners were fleeing Clifford Chance's U.S. offices, but her point about being understood is one echoed by several patent litigators.

"I can't overemphasize the importance of atmosphere for people who come here," says David Francescani, managing partner of IP firm Fish & Richardson's New York office.)

Ben-Ami is typical of patent litigators. She has an undergraduate biochemistry degree and started a Ph.D. in the subject before a switch to law school. The science background was a natural fit for patent work, which often requires the ability to understand and explain complex technology. Ben-Ami has carved out a strong practice, representing pharmaceutical and biotech companies like Genentech, Inc., and Pfizer Inc. She's currently defending Hoffmann-La Roche Inc. against an infringement suit brought by Amgen Inc. over Amgen's erythropoietin anemia drug. (In 2003 Ben-Ami was among *The American Lawyer*'s 45 Under 45.)

Kaye Scholer made an impression, Ben-Ami says, because it understood the need to have a number of lawyers with technology expertise, and it invested in technical advisers to assist them on cases. "It's important when you have big cases -- it's not about one or two partners or associates -- that there's a number of people that can hit the ground running," says Ben-Ami. "Kaye Scholer had the infrastructure and mind-set to deal with these cases."

Building such an infrastructure requires top-notch science grads. But just try finding them. "It is hard to find world-class lawyers with tech degrees," says Harold McElhinny, the head of Morrison & Foerster's IP litigation group. Mark Flanagan, a partner at Wilmer, says his firm has found it difficult to find lawyers with tech degrees since they are gravitating toward IP-centric shops whose ranks are filled with scientists.

Recruiter Anna Tsirulik, of Major, Lindsey & Africa, says firms are to blame for not having enough lawyers with computer, biology and other tech degrees. The problem, she says, is that firms continue to recruit from the same exclusive group of law schools. Law is usually a second career for those with science degrees, she says, and they often go to night school or to a school such as Benjamin N. Cardozo School of Law or Hofstra University School of Law, both of which have a tuition that's lower than that of an Ivy League school like Yale or Harvard.

But firms can rely on lawyers and staff outside their trial team to navigate the technology in a given case. Patent prosecutors, for instance, can help out. Unfortunately for a number of general practice firms, patent prosecution has been eliminated. (Prosecution work is not as profitable as litigation and can be done more cheaply by boutiques.) That was a mistake, some patent lawyers say. "I'm convinced it's absolutely critical for the best firms to have basic scientific and engineering expertise in-house," says MoFo's McElhinny. "Among other things, they help litigators make persuasive and winning arguments," provide strategic options in a case and help bring in clients.

Latham & Watkins has never had a patent prosecution group, but two-and-a-half years ago began a campaign to recruit young lawyers with tech degrees. It held IP seminars at the top 12 law schools it recruits from, and last year it brought in 25 new associates with technology backgrounds. Latham also hired a nonlawyer IP technology analyst to help its IP attorneys with pending litigation, such as Symantec Corp.'s patent infringement/trade secrets case against Microsoft. "I wish I had a bunch more of him," says Robert Steinberg, chair of Latham's 230-lawyer IP litigation department. Steinberg wouldn't divulge the tech guy's name -- he has a Ph.D. from the California Institute of Technology -- saying with a chuckle that he feared competitors would try to steal him away. Steinberg expects that the technologist will eventually run his own department at Latham.

Other firms have been using nonlawyer tech specialists for years. MoFo, for example, has about 15 on staff, Kaye Scholer has about 10 and Fish & Richardson's New York office has five.

Firms may be able to find experienced people to help fill in the gaps with technology. But it's not so easy to find a patent lawyer with trial know-how. A trial background can trigger a frenzy when talent comes on the market.

In February 2003, veteran patent litigator Stephen Korniczky and his fellow partners in San Diego were looking for a new firm after the collapse of Brobeck, Phleger & Harrison. Forty firms came calling. Several took turns pitching Brobeck associates in the firm's six conference rooms. Others showed up without an appointment, strolling through the halls hoping to catch attorneys at their desks. Brobeck partners meanwhile had a whirlwind of meetings off-site. One Silicon Valley firm flew Korniczky and his colleagues to San Francisco, where they were wooed at a luxurious restaurant overlooking the city skyline. "It was an incredibly surreal experience," says Korniczky. The group went to Paul, Hastings, Janofsky & Walker, and he is now chair of its global IP litigation practice.

James Elacqua, who headed Brobeck's IP group in Silicon Valley, was approached by 27 firms in the months before Brobeck dissolved. He and his team jumped to Dewey Ballantine, and then last year he and 13 other lawyers defected to Dechert. Elacqua says he was won over by the firm's strong management team and mix of financial services, technology and pharmaceutical clients. The move to Dechert spurred even more interest in Elacqua. The day he started work, four recruiters called, as well as an in-house lawyer, asking if he'd consider leaving.

It's rare for such a big group to be available, so it's understandable that the Brobeck teams were like catnip to law firms. Paul Hastings was able to steadily grow its IP group after it acquired 35 lawyers from Brobeck's San Diego IP team. Korniczky says the firm looks for partners who are team builders and can help the firm go after clients in a specific industry. It hired five patent litigation partners last year, each of whom brought five or six associates with them: Joseph O'Malley, Jr., and Bruce Wexler from Fitzpatrick, Cella, Harper & Scinto; Robert Masters from Sughrue Mion; and Lawrence Gotts and Michael Bednarek from Pillsbury Winthrop Shaw Pittman. O'Malley and Wexler represent life sciences and pharmaceutical companies, a client base Paul Hastings is seeking to expand and strengthen the firm's IP presence in New York. Masters, Gotts, and Bednarek add depth to the Washington, D.C., office and provide additional clients in Japan and China.

With all of the competition for laterals, a few firms are trying to find ways to grow their practices organically. Wilmer is primarily building its force with associates coming up through the ranks. The firm has 150 lawyers with technical degrees and 75 litigators who spend more than three-quarters of their time doing patent litigation. Lee, the firm's co-managing partner, says Wilmer now mostly hires patent lawyers out of school or from clerkship positions. "We're pretty stingy on making lateral partner offers," he says. "We have a lot of terrific young people coming through the pipeline, so we try not to crowd the playing field." One of its few lateral hires was Mark Flanagan, who jumped from Wilson Sonsini Goodrich & Rosati last year to help Wilmer build its Silicon Valley office, which opened in 2005. A former federal prosecutor, Flanagan had his own firm before joining Wilson and plenty of trial experience.

The trick will be keeping all of those associates. Elacqua, for example, says senior associates can lateral or spin off their own small shops. He's says this has been particularly true in Texas, a plaintiffs-friendly venue where they can tackle contingency cases for patent enforcement shops. He says he lost one of his associates, Dean Munyon, to Austin's Meyertons, Hood, Kivlin, Kowert & Goetzel. "Every time this happens, it leaves a hole," Elacqua says. "You need expertise at every level."

Pitcock at Kasowitz is finding that out himself. Along with veteran patent litigator Lawrence Goodwin, he is trying to build the practice group, which now includes one special counsel and two associates. In addition to the JDS work, they represent software company Modern Creative Services, Inc., in a trade secrets case against Dell Inc., and optical equipment maker Harmonic Inc. in a patent matter. They are also representing two of Kasowitz's existing clients, Adelphia Communications Corp. in litigation relating to its bankruptcy proceedings, and Celanese Ltd. in an infringement suit against Millennium Petrochemicals, Inc. Their experience shows it's not too late to join the crowd clamoring for IP cases. "We're looking to hire," Pitcock says. "We need more people to do the work." So does everybody else.

# Exhibit B

# KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

### 1633 BROADWAY

### NEW YORK, NEW YORK 10019-6799

### 212-506-1700

**MARC E. KASOWITZ**
**212-506-1710**

### FACSIMILE: 212-506-1800

ATLANTA
HOUSTON
NEWARK
SAN FRANCISCO

March 6, 2006

To whom it may concern::

   Jeremy Pitcock has accepted an offer to become a partner at this firm.  I understand he may be seeking financing for a real estate acquisition.  For your information, Mr. Pitcock's first year compensation at our firm on an annualized basis will be $1.2 million.

Sincerely,

*[signature]*

Marc E. Kasowitz

MEK/mg

# Exhibit C

*DRAFT - FOR DISCUSSION PURPOSES ONLY*

## CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE

**THIS CONFIDENTIAL SEPARATION AGREEMENT AND RELEASE** (the "Agreement") is made and entered into by and between Jeremy Pitcock ("Pitcock") and Kasowitz, Benson, Torres & Friedman LLP (the "Firm" or "KBT&F").

**WHEREAS,** Pitcock's partnership in and affiliation with KBT&F terminated as of December 7, 2007 (the "Effective Date"); and

**WHEREAS,** Pitcock acknowledges and agrees that from and after the Effective Date, he can and will no longer hold himself out as a member of KBT&F.

**NOW, THEREFORE,** in consideration of the premises and mutual promises herein contained, it is agreed by and between Pitcock and the Firm as follows:

1.    <u>Severance Benefits</u>:

     a.    <u>Severance Payments</u>. In consideration of Pitcock's obligations set forth in this Agreement, including but not limited to his consent to the General Release set forth in Paragraph 6, his cooperation in transitioning any matters he was working on as of the Effective Date and his agreement to assist in the collection of all billed and unbilled legal fees and expenses for all such matters, KBT&F shall pay Pitcock, as and for severance, the total amount of sixty-thousand dollars ($60,000.00) (the "Severance Payments"). The Severance Payments shall be paid in three equal installments, on December 15, 2007, January 15, 2008 and February 15, 2008, respectively. Pitcock agrees and understands that the Severance Payments are expressly conditioned on his compliance with his obligations under this Agreement and the proper recording and releasing of all of his time entries through December 7, 2007 into the Firm's DTE system. It is further agreed and understood that no 401(k), pension or other benefit

deductions or contributions will be made from the Severance Payments to any Firm pension or benefit plan and, furthermore, that any personal expenses that were incurred by Pitcock and charged to the Firm that have not yet been paid by Pitcock will be deducted from the Severance Payments.

        b.      Tax Liability. Pitcock agrees that he is solely responsible for the payment and reporting of any federal, state and/or local taxes with respect to all payments received by him from the Firm and agrees that he will indemnify the Firm for any liability arising from any non-payment of such taxes including liability for interest and penalties, if any, thereon.

        c.      Telephone & E-Mail. The Firm agrees to forward Pitcock's personal e-mail and telephone calls to such location(s) as may be requested by Pitcock through and until January 15, 2008.

        d.      COBRA Benefits: Pitcock will be eligible, pursuant to COBRA, for continued health insurance coverage at his own expense for up to eighteen (18) months following the Effective Date, provided, however, that the Firm agrees to reimburse Pitcock for the cost of his COBRA coverage premiums for the months of January, February and March 2008 only, said reimbursement to be made on or before March 15, 2008, subject to Pitcock's submission of satisfactory proof of payment of such COBRA premiums.

        2.      Satisfaction of Rights and Capital Account: Within thirty (30) days of Pitcock's execution of this Agreement, the Firm will return Pitcock's capital contribution of [$_____], with the amount of such capital contribution to be paid first to Citibank to pay down Pitcock's outstanding capital loan from Citibank and the balance, if any, of such capital contribution to be distributed to Pitcock. Pitcock acknowledges and agrees that any other rights or interests, including without limitation any membership interests that he may have under or with respect to the Firm (or any members of the Firm) by reason of the Partnership Agreement dated as

2

of January 1, 1994, as amended, or otherwise, have been forfeited and canceled and, further, that he shall have or retain no further such rights or interests therein.

3. <u>Expenses</u>: The Firm shall reimburse Pitcock for necessary and reasonable business expenses actually incurred or paid by Pitcock prior to December 7, 2007 consistent with the Firm's policies in connection with the performance of his duties at the Firm, subject to the presentation of accountings, expense statements or such other supporting documentation as may be required by the Firm.

4. <u>Full Discharge of Obligations</u>: Pitcock understands and agrees that he is not entitled to, and will not receive, any payments or benefits of any kind from the Firm other than those specifically set forth hereinabove. In addition, Pitcock understands and agrees that after the Effective Date, he will not accrue any further benefits under any of the Firm's applicable plans.

5. <u>Cooperation</u>: In consideration of and as a precondition to receiving the Severance Payments and other benefits set forth above in Paragraph 2, Pitcock agrees to assist the Firm with respect to the collection of all billed and unbilled fees and expenses owing to the Firm as a result of services performed during the term of his affiliation with the Firm. From and after the Effective Date, KBT&F shall, consistent with client instructions, be exclusively responsible for such client matters Pitcock handled or was involved in at any time prior thereto, subject to KBT&F's continuing right to terminate such client relationships and responsibilities if such action is warranted; provided, however, that Pitcock shall provide all cooperation that may be reasonably requested of him relating to any and all such matters.

6. <u>Release</u>: As a material inducement to the Firm to enter into this Agreement and to give Pitcock the payments and benefits described above, Pitcock forever releases and discharges the Firm and each of the Firm's predecessors, successors, assigns, partners, officers,

3

managers, counsel, associates, employees, representatives, attorneys, agents, divisions, subsidiaries, affiliates (and past and present partners, officers, managers, counsel, associates, employees, agents, representatives and attorneys of such divisions, subsidiaries, and affiliates), and all persons acting by, through, under or in concert with any of them, from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorneys' fees and costs actually incurred) of any nature whatsoever in law or equity, known or unknown, suspected or unsuspected ("Claims"), that Pitcock, his issue, heirs, representatives, successors, agents, executors, administrators, or assigns, ever had, now has or hereafter can, shall or may have, for, upon, or by reason of any matter, cause or thing whatsoever through the date of this Agreement, including but not limited to, any Claims arising out of his affiliation with the Firm and the cessation of such affiliation, including any Claims for unpaid wages, back pay, draw, commissions, bonuses, incentive pay, vacation pay, legal fees, severance or other compensation, or any claims arising under any contracts, express or implied, or any covenant of good faith and fair dealing, express or implied, or any tort, including, without limitation, intentional infliction of emotional distress, defamation, fraud and breach of duty, or any legal restrictions on the Firm's right to terminate employees, and any federal, state or other governmental statute, regulation, or ordinance, including, without limitation: Title VII of the Civil Rights Act of 1964, the New York State and New York City Human Rights Laws, the Americans With Disabilities Act, the Equal Pay Act, the Family and Medical Leave Act of 1993, the Employee Retirement Income Security Act, the Sarbanes Oxley Act of 2002, and the Rehabilitation Act of 1973, the New York Labor Code, as amended, and the New York Constitution; provided, however, that the foregoing does not affect any right to file an administrative charge with the Equal Employment Opportunity Commission ("EEOC"), subject

4

to the restriction that if any such charge is filed, Pitcock agrees not to violate the confidentiality provisions of this Agreement and Pitcock further agrees and covenants that should he or any other person, organization, or other entity file, charge, claim, sue or cause or permit to be filed any charge with the EEOC, civil action, suit or legal proceeding against the Firm involving any matter occurring at any time in the past, Pitcock will not seek or accept any personal relief (including, but not limited to, monetary award, recovery, relief or settlement) in such charge, civil action, suit or proceeding.  Notwithstanding the foregoing, this Release does not (i) waive any rights Pitcock may have to be covered by the Firm's professional liability insurance with respect to any client claims relating to or arising from his actions and omissions during the period in which he was a member of the Firm or (ii) waive any claims arising from any alleged breach of this Agreement.

7.    No Actions:  Pitcock, for himself, his issue, heirs, representatives, successors, agents, executors, administrators or assigns, hereby covenants and represents that he has not instituted, and will not institute, any complaints, claims, charges or lawsuits with any governmental agency or any court or other tribunal against the Firm (or any member of the Firm), by reason of any claim present or future, known or unknown, arising from or related in any way to his affiliation with the Firm or the cessation of such affiliation, or any relationship, association, or transaction to date between the parties hereto or any of their predecessors or their respective agents, employees or officers.  This covenant shall not apply to actions for breach of this Agreement.

8.    Return of Firm Property and Information:  Pitcock represents and warrants that he has returned to the Firm all FIRM INFORMATION (as defined below) and related reports, files, memoranda and records, cardkey passes, door and file keys, computer access codes, laptops, software and other physical or personal property, which he received or prepared in connection

5

with his affiliation with the Firm; and Pitcock has not retained and will not retain any copies, duplicates, reproductions or excerpts thereof. The term "FIRM INFORMATION", as used in this Agreement, means (i) non-public information including, without limitation, information received from clients or other third parties, information relating to the Firm's clients and information relating to litigations and other matters handled by the Firm and (ii) any other non-public information belonging to the Firm including, without limitation, any technical, business or financial information. Pitcock further acknowledges and agrees that he (i) will keep and maintain all FIRM INFORMATION confidential at all times, (ii) will not disclose or communicate FIRM INFORMATION to any third party and (iii) will not make use of FIRM INFORMATION on his own behalf or on behalf of any third party. Notwithstanding the foregoing, nothing in this Paragraph 8 shall preclude Pitcock from disclosing to prospective employers the amount of his collections and billings on matters that he originated and his total billable hours at the Firm.

9.    Return of Personal Property:  Following the execution of this Agreement, on a day to be mutually agreed upon, Pitcock will be allowed access to his office and any files or boxes that Pitcock brought with him when he joined KBT&F, or that Pitcock otherwise maintains are his personal property, and shall be allowed, under whatever reasonable supervision KBT&F deems appropriate, to tag, or place in boxes and tag, all such materials so that they may be efficiently transferred to a new non-KBT&F location. Any disputes shall be resolved through good faith discussion. In the unlikely event that a material dispute arises as to whether a file or materials belongs to the Firm or Pitcock, the Firm retains the right in its sole discretion to resolve the dispute.

10.    Non-Disparagement:  Pitcock agrees not to disparage, or make any disparaging remark or send any disparaging communications, concerning the Firm, its reputation, its practice,

and/or its partners and employees.

11.    <u>Neutral Reference</u>:  The Firm agrees to respond to employment inquiries
concerning Pitcock's affiliation with the Firm by informing those persons or entities requesting
such information only that the Firm's policy is to confirm the following information for former
employees and partners:  the dates of employment and position with the Firm; such information
will then be provided to the person or entity requesting the information.  Pitcock's compensation
information shall only be provided by the Firm to a person or entity in response to an
employment inquiry upon Pitcock's express written consent.  In the event any person should
inquire as to the reason Pitcock no longer is affiliated with the Firm, the Firm or Pitcock, as the
case may be, shall respond by stating that Pitcock resigned for personal reasons, or words of like
import.

12.    <u>Rule of Ambiguities</u>:  It is agreed and understood that the general rule that
ambiguities are to be construed against the drafter shall not apply to this Agreement.  In the event
that any language in this Agreement is found or claimed to be ambiguous, each party shall have
the same opportunity to present evidence as to the actual intent of the parties with respect to any
such ambiguous language without any inference or presumption being drawn against the drafter.
In the event that one or more of the provisions of this Agreement shall become invalid, illegal or
unenforceable in any respect, the validity, legality and enforceability of the remaining provisions
contained herein shall not be affected thereby.

13.    <u>Non-Admission of Liability</u>:  This Agreement is not, and shall not in any way be
construed as, an admission by the Firm or Pitcock that they have acted wrongfully with respect
to each other or any other person, or that the parties have any rights whatsoever against each
other except as set forth herein.  Further, nothing in this Agreement shall in any way be
construed as an admission by the Firm that Pitcock has any basis or standing to assert any

7

statutory or common law claims against the Firm.

14.    <u>Representation</u>:  Pitcock acknowledges that he was advised by the Firm to consult with an attorney of his own choosing concerning the waivers contained in this Agreement, and that the waivers Pitcock has made herein are knowing, conscious and with full appreciation that Pitcock is forever foreclosed from pursuing any of the rights so waived.

15.    <u>No Modification</u>:  No waiver or modification of this Agreement or any term hereof shall be binding unless it is in writing and signed by the parties hereto or their expressly authorized representatives.

16.    <u>Choice of Law</u>:  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to principles of conflicts of law.  Pitcock irrevocably agrees to submit to the exclusive jurisdiction of the state and/or federal courts located within the State of New York for the resolution of any claim, dispute or controversy that in any way arises under, or refers or relates to, this Agreement or Pitcock's affiliation with the Firm.  The Firm and Pitcock each hereby waive, as against the other, trial by jury in any judicial proceeding to which they are both parties involving, directly or indirectly, any matter in any way arising out of, related to or connected with this Agreement or Pitcock's affiliation with the Firm.

17.    <u>Injunctive Relief</u>:  Pitcock agrees and acknowledges that the Firm will be irreparably harmed by any breach, or threatened breach, by him of Paragraph 8 of this Agreement and that monetary damages would be grossly inadequate.  Accordingly, he agrees that in the event of a breach, or threatened breach, by him of this Agreement the Firm shall be entitled to apply for immediate injunctive or other preliminary or equitable relief, as appropriate, in addition to all other remedies available at law and equity.

8

18.    No Disclosure: Pitcock agrees not to disclose to anyone, other than his immediate family, accountant and attorney, and outplacement advisor, the existence of this Agreement, the circumstances surrounding it, its terms, conditions or negotiation, including the dollar amounts set forth herein, and then only upon their express agreement not to disclose such subject matter to another person, except as required by law.  The Firm will not disclose to any third parties other than its accountant and attorneys the existence of this Agreement, the circumstances surrounding it, its terms, conditions or negotiation, including the dollar amounts set forth herein, unless ordered by a court or required by law.

19.    Notices: All notices required or permitted hereunder shall be in writing and deemed sufficiently given for all purposes hereof if (i) delivered in person, by courier (e.g., by Federal Express) or by registered or certified United States Mail to the party to be notified, with receipt obtained, or (ii) sent by facsimile transmission, with "answer back" or other "advice of receipt" obtained, in each case to the appropriate address or number as set forth below.  Each notice shall be deemed effective on receipt by the addressee as aforesaid; provided that, notice received by facsimile transmission after 5:00 p.m. at the location of the addressee of such notice shall be deemed received on the first business day following the date of such electronic receipt. Notices to Pitcock shall be addressed as follows:

> Jeremy Pitcock
> 401 North Woodland Street
> Englewood, New Jersey 07631


Notices to the Firm shall be addressed to:

> Aaron H. Marks, Esq.
> Kasowitz, Benson, Torres & Friedman LLP
> 1633 Broadway
> New York, New York 10019

9

20.  Successors and Assigns:  This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors, assigns, heirs, administrators, and executors.

21.  Entire Agreement:  This Agreement sets forth the entire agreement between the parties hereto, and fully supersedes and replaces any and all prior agreements or understandings (whether oral or written) between the parties hereto pertaining to the subject matter hereof including the above-referenced Partnership Agreement.  The parties acknowledge and agree that in signing this Agreement they have not relied upon any representation, promise or inducement that is not expressly set forth in this Agreement.

22.  Review Period:  Pitcock shall have a period of seven (7) days from the date on which a copy of this Agreement has been delivered to him to consider whether to execute it, which period of time Pitcock agrees is reasonable and acceptable to him.

23.  Voluntary Execution:  Pitcock hereby acknowledges that he has read and that he understands the foregoing Agreement and that he has affixed his signature hereto voluntarily and without coercion.


**PLEASE READ CAREFULLY.  THIS SEPARATION AGREEMENT AND RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**


Executed, this _____ day
of _____, 2007

_____
JEREMY PITCOCK


Executed, this _____ day
of _____, 2007

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

10

By: _____
A Partner

# Exhibit D

# Intellectual Property Today™


RFC *Express*™
New Patent
Lawsuits
14-Day Trial Click Here

Home | Issues | News | Classified | Jobs | Reports | Poster | Subscribe | Links | Contact | RFC Express



**2008 Top Patent Firms**
*Now Available*

**2008 Top Trademark Firms**
*Now Available*



Do you have a question comment, suggestion?
**Send Feedback**

Click Here

Back to Miscellaneous News



## Jeremy S. Pitcock Joins Morgan & Finnegan
Monday, January 07, 2008

New York, NY -- Morgan & Finnegan, L.L.P., one of the nation's premier intellectual property law firms, has announced that Jeremy S. Pitcock has joined the firm as a partner, effective Jan. 1, 2008. Mr. Pitcock, who formerly headed the intellectual property litigation practice at Kasowitz Benson Torres & Friedman, has substantial experience in litigating patent, copyright, trade secret and trademark matters.

"Jeremy brings an extraordinary amount of depth and experience in all phases of intellectual property law to our firm, and we are very pleased that he has joined Morgan & Finnegan," said John F. Sweeney, a senior partner and member of the firm's Executive Committee. "We are sure he will be an outstanding addition to our successful litigation practice, and his experience in the federal courts and the U.S. Patent and Trademark Office will continue to enhance the level of service we provide to our clients."

"I am delighted to join such a highly regarded firm, and see this as an exciting opportunity to be part of a group of such talented professionals," said Mr. Pitcock. "Morgan & Finnegan is one of the top IP firms in the world and I look forward to drawing upon its strengths and working alongside such an accomplished team."

Mr. Pitcock has extensive experience in a variety of complex technologies, including fiber optic networks and optical components, computer hardware and software, telecommunications, lasers, semiconductors, pharmaceutical inventions and business methods. He has a long and distinguished trial record, as well as a record of successful settlements on behalf of clients he has represented.

Before joining Kasowitz, Mr. Pitcock was an associate at Simpson Thacher & Bartlett. He received his J.D. from the University of Pennsylvania School of Law in 1998 and his B.S. in physics from the Massachusetts Institute of Technology in 1994. Mr. Pitcock, 35, resides in Englewood, NJ.

Morgan & Finnegan, L.L.P. is one of the country's leading intellectual property law firms, with offices in New York, Washington, D.C. and California. The firm provides a full range of intellectual property legal services to clients throughout North America, Asia and Europe, in industries ranging from banking and financial services, electronics and e-commerce to life sciences, pharmaceuticals and computer hardware and software. Additional information about the firm can be found at www.morganfinnegan.com.

Back to Miscellaneous News

© Copyright 2007 Intellectual Property Today — Designed By WebsiteAtWork.com

Home • Issues • News • Classified • Jobs • Reports • Poster • Subscribe • Links • Contact
Legal Statement • Privacy Policy • Terms of Use • RFC Express • Sitemap


IP LAW FIRMS
PRODUCTS & SERVICES

**Patent Attorney/Engineer**
Over 36 years experience. Staff available 24/7 by phone.
www.invention net

**Patent Law Firm**
Experienced patent attorneys. Affordable IP legal services.
www.olpatentlaw.com

**Patents & Trademarks**
NJ & NY Intellectual Property Attny Law Office of Michael Feigin, Esq.
PatentLawNY.com

**Maryland IP Firm**
Firm Specializes in Patent Search & Filing. Free Initial Consultation!
www.IPProcurement.com


Get Adobe Reader

# Exhibit E



Portfolio Media, Inc. | 648 Broadway, Suite 200 | New York, NY 10012 | www.law360.com

Phone: +1 212 537 6331 | Fax: +1 212 537 6371 | customerservice@portfoliomedia.com

## Morgan & Finnegan Nabs Kasowitz Benson IP Leader

*1/15/2008* — The former head of the intellectual property group at Kasowitz Benson Torres & Friedman will now lend his expertise to a different firm after jumping ship to become a partner at Morgan & Finnegan LLP.

Jeremy S. Pitcock, who lead the intellectual property litigation practice at Kasowitz Benson, has joined Morgan & Finnegan as a partner in the firm's New York office. Pitcock's practice will focus on litigating patent, copyright and trademark cases.

"Jeremy brings an extraordinary amount of depth and experience in all phases of intellectual property law to our firm, and we are very pleased that he has joined Morgan & Finnegan," said John F. Sweeney, a senior partner and member of the firm's executive committee. "We are sure he will be an outstanding addition to our successful litigation practice, and his experience in the federal courts and the U.S. Patent and Trademark Office will continue to enhance the level of service we provide to our clients."

Pitcock said he looked forward to joining such a renowned intellectual property team.

"I am delighted to join such a highly regarded firm, and see this as an exciting opportunity to be part of a group of such talented professionals," Pitcock said. "Morgan & Finnegan is one of the top IP firms in the world and I look forward to drawing upon its strengths and working alongside such an accomplished team."

Pitcock has advised clients in a variety of industries, gaining expertise in technologies like fiber-optic networks and optical components, computer hardware and software, telecommunications, lasers, semiconductors, pharmaceutical inventions and business methods.

Pitcock has litigated several notable cases, including Litton v. Harmonic, in which he represented Harmonic in a case brought jointly by Stanford University and Litton Systems Inc. over patents covering optical amplifiers. Pitcock successfully petitioned the court to dismiss the case.

Morgan Finnegan's newest partner also litigated JDSU v. Metconnex, in which he represented plaintiff JDSU in a patent infringement case involving a technology used to rout laser beams. The parties eventually settled the case out of court, and Metconnex agreed to halt the production of the allegedly infringing device.

Before joining the IP group at Kasowitz Benson, Pitcock worked as an



associate at Simpson Thacher & Bartlett.

Morgan & Finnegan offers a range of services in the intellectual property area, including procurement of patents and trademark registrations in the U.S. Patent and Trademark Office, intellectual property enforcement in U.S. courts and defense against charges of infringement in the courts and at the International Trade Commission.

Founded in 1893, Morgan & Finnegan has more than 100 lawyers and scientific and technical advisors all devoted to patent, trademark, unfair competition, copyright, trade secret and other intellectual property matters. The firm is headquartered in New York and has offices in San Francisco and Washington, D.C.

# Exhibit F

Kasowitz, Benson, Torres and Friedman LLP., made the following statement today:

Recent news items have reported, following a news release by a law firm, Morgan & Finnegan, that Jeremy Pitcock left Kasowitz, Benson, Torres and Friedman LLP., to join that firm. Some news items incorrectly reported that Mr. Pitcock had 'defected' or 'jumped ship.'

The fact is that Mr. Pitcock was terminated for cause by our firm in December, 2007, because of extremely inappropriate personal conduct. We were not looking to publicize this incident, but because of those incorrect news items, we feel compelled to set the record straight.

For more information contact Seth Faison, Sitrick and Company, 212-573-6100.

# Exhibit G



# LAW.COM

Select 'Print' in your browser menu to print this document.

Copyright 2008 ALM Properties, Inc. All rights reserved.

Page printed from: http://www.law.com

**Back to Article**

## Kasowitz Fired its ex-IP Chief for Inappropriate Conduct

Nate Raymond
The American Lawyer
01-22-2008

The former head of intellectual property at Kasowitz,
Benson, Torres & Friedman was fired in December for
"extremely inappropriate personal conduct," according to
the firm.

Jeremy Pitcock, 35, joined Kasowitz in March 2006 after
being wooed from Simpson Thacher & Bartlett, where he
was a senior associate. Kasowitz named him head of IP
not long after. But after less than two years, Pitcock left
the 200-plus-lawyer firm for 52-lawyer New York IP
boutique Morgan & Finnegan.



Morgan touted Pitcock's hiring as "an outstanding addition to our successful litigation practice" when it
announced his move on January 8. But the Kasowitz firm says he was forced out following an unspecified
incident.

"Mr. Pitcock was terminated for cause by Kasowitz, Benson in December 2007 because of extremely
inappropriate personal conduct," name partner Daniel Benson said in a statement.

Pitcock on Tuesday declined to comment on the conduct the firm referred to in its press release. "It's nothing
professional," he said. "It has absolutely nothing to do with my practice."

Kasowitz partner and management committee member Eric Wallach said that, as far as he knows, Morgan &
Finnegan did not call anyone of authority at the firm before hiring Pitcock.

Morgan & Finnegan declined to comment on what a spokesperson described as "an alleged personnel matter
at another firm." In an earlier interview, John Sweeney, a senior partner at Morgan and member of the firm's
executive committee, said that Pitcock approached Morgan and not the other way around, in late December.
"We didn't really look for him, he looked for us," Sweeney said.

Kasowitz's statement followed the publication of an article in trade publication IP Law 360 last week, which
reported that Morgan had lured Pitcock from Kasowitz. In his statement, directed toward the publication,
Benson said, "It was inaccurate to use 'nab' in your headline, or to use 'jump ship' in your opening
paragraph."

"We were not looking to publicize this incident, but because of those incorrect news items, we felt compelled
to set the record straight," Benson said in a press release that the firm distributed online.

Law firms rarely make public negative comments about lateral moves, and almost never with their own press

releases. In 2002 Pillsbury Winthrop issued a press release, which claimed that a former partner who left for Latham & Watkins, Frode Jensen III, departed "on the heels of sexual harassment allegations" after "a significant decline in his productivity." Jensen called the allegations false, sued the firm, and settled for a reported $5-10 million.

Pitcock said he was surprised by the Kasowitz press release. "I thought it was unusual that it came out weeks after I joined Morgan & Finnegan, and they knew I joined," he said.

Wallach said Pitcock was terminated December 7 following a "thorough," weeklong investigation into reported inappropriate conduct, which the firm would not describe. The investigation ended with the firm firing Pitcock. "The firm's action was consistent with its zero-tolerance policy for such misconduct," Wallach said.

Pitcock said he wishes his former firm well, despite its recent comments about his departure. "I was hoping for it to be amicable," he said. "It obviously hasn't been as amicable as I would like."

Pitcock's alleged conduct and firing comes as an embarrassment to the New York-based Kasowitz, which competed vigorously with other national outfits for the then Simpson Thacher associate. Like many firms, Kasowitz had been trying to break into the lucrative IP litigation field. According to Am Law 200 figures published last June in The American Lawyer, Kasowitz had gross revenue of $141 million and profits per partner of $1.5 million, which ranked 160th and thirty-first, respectively.

"I was getting calls from recruiters all the time," Pitcock said at the time. When he left Simpson for Kasowitz, he brought with him a patent case involving JDS Uniphase Corporation, which retained Kasowitz for other litigation. With veteran patent litigator Lawrence Goodwin, who joined in January 2006 from Chadbourne & Parke, Pitcock worked to build up the new practice. The group now has two partners, one special counsel, and five associates. By early 2007, Pitcock was head of IP at the firm.

Benson said Pitcock did not take any clients with him in the move, though on Morgan's Web site Pitcock lists JDSU, Harmonic Inc., Euro RSCG Worldwide, Inc., Shaklee Corporation, and Bridge Associates, LLC, as "representative clients." Pitcock declined to comment on whether Benson's statement was accurate. "The clients will do what the clients will do," he said. Benson said Kasowitz's IP group is now headed by Goodwin and Peter Toren, and that it had not experienced any defections.

Pitcock said he had no reason to believe his new job at Morgan was in jeopardy because of Kasowitz's announcement. Morgan is "more appropriate for me and my practice," he said.

Over the last two years, Morgan has suffered several defections, dropping from 37 partners in 2006 to 26 today. Seven partners have left for Cadwalader, Wickersham & Taft since August, with three swapping out partnerships for special counsel status. Other partners have taken their associates to Covington & Burling, Goodwin Procter, and King & Spalding. A former Morgan partner says management issues are to blame.

E-mail: nraymond@alm.com

# Exhibit H

WSJ.com    MarketWatch.com    Barrons.com    All Things Digital    More

Enter Symbol(s) or Keyword(s)    [SEARCH]

# THE WALL STREET JOURNAL.

User Name:    Password:
✓ Remember Me . . . Log In >-

Set My Home Page : Customer Service

**News**    **Today's Newspaper**    **My Online Journal**    **Multimedia & Online Extras**    **Markets Data & Tools**    **Classifieds**

**LAW BLOG**
WSJ.com on law and business and the business of law.    **Blog Search:**  ●

< Fred Thompson (Vandy Law '67) Quit[...] -- Previous | SEE ALL POSTS FROM THIS BLOG | Next -- Two Sides to the Anderson Kill, Reed Smif...] >

January 22, 2008, 4:33 pm

## Kasowitz Benson Issues Negative Statement About Ex-Partner

Posted by Peter Lattman



Earlier this month, IP boutique Morgan & Finnegan announced that Jeremy Pitcock joined its firm from Kasowitz Benson. The Law Blog receives announcements like this one all the time, so it didn't registered on our radar screen. Until today.

In a rare instance of a firm issuing a negative public statement about a former lawyer, Kasowitz Benson said today that its former head of IP was fired in December for "extremely inappropriate personal conduct," but didn't elaborate. The American Lawyer first reported on the news. Pitcock joined Kasowitz in March 2006 from Simpson Thacher, where he was a senior associate.

Why did Kasowitz Benson, a firm known for its aggressive litigation tactics, issue such a statement? They were peeved by a story last week in trade pub IP Law 360 that said Morgan had lured Pitcock from Kasowitz. In his statement directed toward IP Law 360, name partner Dan Benson said, "It was inaccurate to use 'nab' in your headline, or to use 'jump ship' in your opening paragraph."

AmLaw connected with Pitcock, who said the reason for his departure from Kasowitz "has absolutely nothing to do with my practice." He also said he had been hoping for an amicable departure. A Morgan & Finnegan spokesperson described the situation to AmLaw as "an alleged personnel matter at another firm."

Said Benson in his statement: "We were not looking to publicize this incident, but because of those incorrect news items, we felt compelled to set the record straight."

Permalink | Trackback URL: http://blogs.wsj.com/law/2008/01/22/kasowitz-benson-issues-negative-statement-about-ex-partner/?mod=WSJBlog/trackback/
Save & Share: Share on Facebook | Del.icio.us | Digg this | Email This | Print
Read more: Intellectual Property, Lawyers & Law Firms
    More related content

**Comments**
Report offensive comments to lawblog@wsj.com

So a reporter - not the lawyer - uses the terms "nab" and "jump ship," terms used almost automatically these days in such articles, and Kasowitz et al. feel compelled to try to ruin this guy's life? Nice.

Comment by Anonymous - January 22, 2008 at 4:51 pm

"Extremely inappropriate personal conduct" must mean he was only billing 8 hours per day.

Comment by Curious - January 22, 2008 at 4:55 pm

gotcha

Comment by Zing!!! - January 22, 2008 at 4:56 pm

The Law 360 publications are all terribly written and reported. I don't know why anyone would get worked up over what they have to say.

VISIT WSJ.COM'S LAW PAGE >
OTHER BLOGS FROM WSJ.COM

● Law Blog                     ● MarketBeat
● Washington Wire             ● Deal Journal
● Real Time Economics         ● Developments
● The Juggle                  ● The Numbers Guy
● Health Blog                 ● The Wealth Report
● Environmental Capital       ● Baghdad Life
● Business Technology         ● Independent Street
● The Daily Fix

More

advertisement



UNIFIED COMMUNICATIONS DRIVES BUSINESS FORWARD

NORTEL
www.hyperconnectivity.com    Ads by Google

**SEARCH LEGAL NOTICES**

Complete one or more of the following fields:

Date Range:
    All Dates    ·

Category:
    All Categories    ·

Keyword(s)

Need help? View our    [Search]
Search Tips

**MOST POPULAR POSTS**    VIEWED    EMAILED

1. Romney Shows His Funny Side
2. '4 Minutes' of Fame: How Hannah Montana Made Madonna More Relevant
3. Clinton Campaign Is in the Red
4. Voter Psychology: A Case for an Obama Victory?
5. Mean Street: 'You Cannot Beat the Market. Nobody Can.'
6. Deals of the Day: Fertilizer and 'Titanic' Kick Off New IPOs
7. Four nt Four: Selling Banks, Buying Tech
8. What to Do With Yahoo
9. Security Is No Match for Chocolate and Good Looking Women
10. A National Sell-Off in the City

▶ E-MAIL SIGN-UP

Comment by Solomon Grundy - January 22, 2008 at 5:08 pm

We be feelin' a wee bit "touchy" today, are we K&B?

Comment by Legal Beagle - January 22, 2008 at 5:23 pm

So he nailed a paralegal in a broom closet.
Who cares?

Comment by it happens all the time - January 22, 2008 at 5:33 pm

The grammar and punctuation in the Kasowitz press release is appalling.

Comment by Anonymous - January 22, 2008 at 5:37 pm

Very bad form by Kasowitz. If the guy is a loser who cares. Kasowitz should have taken the "high" road and said we are not sorry to see him go and we wish him all the best.

Comment by Anonymous - January 22, 2008 at 5:45 pm

Ironic that it says to "report offensive comments" about a story about offensive comments. K&B's statement reflects quite poorly on it as a firm. It could have made quiet, less overt comments to any clients it actually feared it might lose to M&F. Instead, it showed its lawyers, staff, clients and the public that it can be really, really vicious when provoked in the slightest manner.

Comment by Ironic - January 22, 2008 at 5:55 pm

Can you really fire a partner? Isn't it more of a dissolution of the P-ship? This is too much information without enough of the juicy details.

Comment by KH - January 22, 2008 at 5:55 pm

That Benson chap sounds like a charmer. Agree with everyone above (certainly all of whom appear to be well above Mr. B). Will we see a dose of karma on these pages with some good dirt on Mr. B? What goes around certainly comes around, Mr. B.

Comment by anon - January 22, 2008 at 6:31 pm

Lets hope that K&B has a few attorneys who can put pen to paper betterer than whatever moron wrote that press release.

Comment by Wow - January 22, 2008 at 6:40 pm

Did they learn nothing from Pillsbury's manager partner, Mary Cranston, and her public proclamations years ago that resulted in a big settlement for the subject of Pillsbury's negative press release?

Comment by Diary - January 22, 2008 at 7:24 pm

As a law student, I am turned off by this firm's behavior. Who would want to join that kind of culture?

Comment by Bjorn Borg's Beard - January 22, 2008 at 10:13 pm

Why on earth would anyone bother with a statement like that? Mary Cranston and Marina Park decided to put out a nastygram about one of their former partners as he departed a few years back, when they should have just been thanking the heavens that their problem partner was about to become someone else's. What they got instead was a lawsuit, because the creep they'd seen out the door to another firm was no longer welcome where he'd been headed and, voila! damages!

Comment by Peanut Gallery - January 22, 2008 at 10:32 pm

I interviewed there, and let me just say, the feeling that such snarkiness was lurking in the background dripped from the walls...

Comment by been there, didn't do that - January 22, 2008 at 10:42 pm

why didn't they fire the guy who got them sanctioned? judge owen should sanction the firm again.

Get a roundup of the day's Law Blog posts, plus the latest law news. Check the box below to subscribe.

☐ Law Blog Newsletter

[ Save Settings ]

To view all or change any of your e-mail settings, click to the E-Mail Setup Center

**RELATED ARTICLES AND BLOGS**
More related content   *Powered by Sphere*

## ABOUT THIS BLOG

The Wall Street Journal's Law Blog focuses on law and business, and the business of law. Dan Slater is the lead writer. Dan joined . The Wall Street Journal from The Deal magazine. Before becoming a journalist, Dan worked as a litigator at a New York law firm. The blog's founding writer was Peter Lattman, who now covers private equity for the Journal.

The Law Blog also includes contributions from reporters and editors at the Journal and Dow Jones Newswires. Have a comment or tip? Write to lawblog@wsj.com.

## Subscribe

RSS -- subscribe to updated headlines to read from anywhere on the Web. For more about RSS, click here.

📶 Law Blog

## Save & Share

Digg -- submit this item to be shared and voted on by the digg community. For more about digg, click here.
Del.icio.us -- mark an item as a favorite to access later or share with the del.icio.us community. For more about del.icio.us, click here.
Facebook -- share an item with users of Facebook, a collection of school, company and regional social networks. For more about Facebook, click here.

## PAST POSTS

| January 2008 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| M | T | W | T | F | S | S |
| | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 | | | |
| « Dec | | | | | Feb » | |

## TOP LAW STORIES

Arbitration Firm Questioned Over Neutrality

SocGen Trader's Supervisor Files Suit

High Court Rejects Exxon Appeal

MORE

Case 1:08-cv-05166-JES    Document 1    Filed 06/05/2008    Page 72 of 82

Comment by Anonymous - January 23, 2008 at 9:13 am

Remind me never to apply for a job at Kasowitz Benson. Not a very classy firm.

Comment by Anonymous - January 23, 2008 at 9:17 am

Kasowitz is just a wildly nasty, sleazy shop. Litigating against them is always interesting - their incompetence is matched only by their arrogance.

Comment by Linda - January 23, 2008 at 9:22 am

If I followed the story correctly, he went from senior associate in March 06 to head of the IP department in December 07? Pretty low standards over there, I guess.

Comment by anon - January 23, 2008 at 10:05 am

What in the world comprised the "extremely inappropriate personal conduct" that everyone keeps referring to?

Comment by Curious George - January 23, 2008 at 1:36 pm

Well, I know not to consider K&B next time we're looking for outside counsel.

Comment by G.C. - January 23, 2008 at 1:48 pm

we all want to know the answer to that one-I am torn between honest billing, the stray paralegal and something involving sheep. speculate away.

Comment by Anonymous - January 23, 2008 at 2:34 pm

One form of "extremely inappropriate personal conduct" could be surfing inappropriate web sites........?!?!?!?

Comment by perske account - January 23, 2008 at 2:39 pm

"Extremely inappropriate personal conduct" must mean sliming some attorney in a poorly-written press release.

Remind me never to do business with or refer cases to Kasowitz Benson.

Comment by I know! I know! - January 23, 2008 at 4:36 pm

Has Kasowitz Benson ever appeared in the Law Blog before? Yes, it has.
http://blogs.wsj.com/law/2007/03/23/biovail-says-bye-bye-to-kasowitz-benson/

Comment by Anonymous - January 23, 2008 at 6:09 pm

Well, we can all wish justice on the Kasowitz firm, since they obviously do not believe in mercy. Tacky and slimy no matter what the guy did. They who live by the sword shall surely die by it --and early

Comment by warrior - January 23, 2008 at 7:38 pm

Anonymous 5:37 pm: The grammar and punctuation ARE appalling.

Comment by Doug Pappas - January 24, 2008 at 1:07 am

Anyone familiar with the behavior of K&B will understand how ironic that story really is. Inappropriate personal conduct indeed.

Comment by AlsoAnon - January 24, 2008 at 2:57 pm

I'm a recruiter and know Pitcock. Not a bad guy at all, actually.

Comment by Steve - January 25, 2008 at 12:42 am

There are two sides to this story. Anyone familiar with what's going on with New York city intellectual property outfits knows that Morgan Finnegan is a law firm on life support. When it was reported that this guy went there, everyone was saying "what is so bad about Kasowitz that would make someone 'jump ship' for Morgan Finnegan." It looked really really bad for Kasowitz. This press release was obviously a response to that.

Case 1:08-cv-05166-JES    Document 1    Filed 06/05/2008    Page 73 of 82

Comment by Anon - January 26, 2008 at 2:27 pm

Response to 1/26 2:27 pm

Terminated partners should not be spouting off about firms on "life support."
You should be trying to correct your personal productivity issues which caused
your termination.

Comment by Rebutter - February 8, 2008 at 12:49 pm
Post a Comment

Name :

Comment:
[ Submit ]

VISIT WSJ.COM'S LAW PAGE ▶

Return To Top

WSJ Digital Network
MarketWatch | Barrons.com
AllThingsDigital | Dow Jones News Alerts | MORE

Subscribe   Log In   Take a Tour   Contact Us   Help   Email Setup   Customer Service: Online | Print
Privacy Policy   Subscriber Agreement & Terms of Use   Copyright Policy   Mobile Devices   RSS Feeds
News Licensing   Advertising   About Dow Jones
Copyright © 2008 Dow Jones & Company, Inc. All Rights Reserved
DOWJONES

Life at Work - stuff.co.nz                                                    Page 1 of 3

Stuff   Trade Me   Travelbug   Find Someone   Old Friends   Smaps   RugbyHeaven                    RUGBY HEAVEN



Wednesday, 23 Apr 2008

News   Sport   Entertainment   Business   Tech   Lifestyle   Travel   Blogs   Newspapers   Magazines                    GO

Stuff > Business > Blog: Life at Work

RSS Feed    Email alerts   Text alerts   RSS Feeds    Make Stuff.co.nz my homepage

# Life at Work
A lawyer's view on NZ employment law, and today's workplace

## Dear World: we fired this guy

Andrew Scott-Howman in Life at Work | 11:56 am 28 January 2008

It probably goes without saying: people move between jobs all the time. In fact, lateral movement is regarded as an increasingly common phenomenon associated with Gen Y.

So it's not uncommon to see an advertisement (particularly in an industry publication) placed by an employer, letting the world know about its latest appointment in a particular role.

So we get to know quite a bit about an employee's new job - but what about their reason for leaving their last role? Can that ever be a matter of public information?

Earlier this month, a law firm in New York, Morgan & Finnegan, announced that a well-known lawyer - Jeremy Pitcock - was joining it as a partner. Nothing unusual there.

What turned things nasty, however, was an article in a trade publication which apparently said that Pitcock had "jumped ship" from his previous employer, Kasowitz Benson - and suggested that the new firm had "nabbed" Pitcock.

Not so, said the old firm. It made a public statement, saying that Pitcock had, in fact, been dismissed for "extremely inappropriate personal conduct".

Kasowitz Benson was peeved by the story about the change of employer, and effectively wanted to set the record straight.

Ouch. One might imagine that Mr Pitcock would find that pretty objectionable. Surely this couldn't happen under New Zealand law.....

Mercifully, I'm not aware of any case in this country quite like this one. Here is how the law here applies:

• If an employee cites a previous employer as a referee, the employer has to be honest in providing its answers to questions. Generally, an invitation to be a referee operates as consent by the employee for the employer to disclose personal information about him or her.

But this wasn't a case about a referee giving a reference....

• If an employee negotiates terms of departure (especially at mediation), those terms are usually agreed to be confidential - so the employer couldn't publicise them.

But that wasn't the case here either....

• An employee can sue an old employer for defamation, but a defence to that claim would be truth: that the employer was factually correct in the information that it published about the employee's departure.

Assuming that the old employer made sure it was factually accurate, defamation would probably not be a tenable claim under New Zealand law.

So I think the case might come down to a claim for breach of privacy - the publication by the old employer of private facts, where an ordinary person would regard that publication as offensive. In this country, that's a developing area of law (Mike Hosking's case some years ago was one which set some new boundaries in New Zealand).

If that's right, I guess a material question is whether an ordinary person would regard this sort of thing as offensive. What do you think?

How would you feel if your old employer issued a press release detailing the reasons for your departure to greener pastures?

Outrageous action by the old employer, or justifiable defence of the public position by "setting the record straight"?



Andrew Scott-Howman is a New Zealand lawyer who specialises in employment law. He is a partner at Bell Gully, and is the employment law columnist for The Independent Financial Review.

Sponsored Links

Recent Posts

Protecting Baldy, Big Ears and Big Nose (Andrew Scott-Howman in Life at Work)

Ellen and that Hawaii chair (Andrew Scott-Howman in Life at Work)

Thank you for smoking... (Andrew Scott-Howman in Life at Work)

The 'sexing up' of female employees (Andrew Scott-Howman in Life at Work)

Pornography: a workplace double standard? (Andrew Scott-Howman in Life at Work)

Interviewing for a job: the first 30 seconds (Andrew Scott-Howman in Life at Work)

German supermarket spies on its workers .. (Andrew Scott-Howman in Life at Work)

Sherlock Holmes in your workplace? (Andrew Scott-Howman in Life at Work)

'At risk' salary: no thank you, or bring it on? (Andrew Scott-Howman in Life at Work)

The workplace birthday celebration: how do you measure up? (Andrew Scott-Howman in Life at Work)

Advertisement

3 Comments

Difficult. I would find it offensive, and would regard the previous employer's actions as inappropriate if not illegal (in New Zealand) in terms of the Privacy Act.

It was claimed that he "jumped ship" to go and work for a new company. This might actually be true, despite the fact he was fired. For all I know, he may have been in the process of jumping before he was pushed.

Either way, stating he "jumped ship" says nothing about the previous employer, and does not cast aspersions upon them. Only if that had happened would I regard revealing personal information warranted.

Based on what I read above, there is no "record" to set straight.

If I changed jobs and made some sort of public or industrial declaration that my previous employer was terrible yadda yadda yadda, and it turned out I was dismissed, then and only then is it fair for that previous employer to come back with a response.

*Comment by Gravey — 28 January 2008 @ 2:46 pm*

I left a job a few years ago preferring to be a housewife than continue in an untenable work situation. I decided I didn't have the energy to pursue a grievance so just quietly crept away to find greener pastures. I was then suprised to find out a couple of months later that my former employer was telling everyone who enquired after me and/or asked how to contact me (in a couple of cases with offers of consulting work) that I had left the country to join my partner who was working 4 weeks on 2 off overseas. I got the distinct impression they were embarrassed at yet another staff member deciding that it was better to have no work than work for them and felt they need a good explanation for my abrupt departure.

*Comment by Wonda — 29 January 2008 @ 11:21 am*

I would agree with Gravey - from the information given there was no derogatory implication to the previous employer in "jumped ship". Indeed the implication is one of lack of loyalty by the erstwhile employee.

Likewise "nabbed" implies that the second firm head-hunted or "poached" a valued employee - something too, which has less than ethical implications on their behalf.

If this is accepted then the actions of the previous employer not only breach privacy concepts but also would appear to be defamatory.

The employee was not giving the previous employer as a referee, therefore that "escape clause" is closed. The public statement in rebuttal of the "nabbed" implication was to my mind definitely defamatory. No case had been stated or implied that involved the original employer - for them to even enter the arena was ethically wrong.

Once upon a time (all good stories begin that way) the test in British Law for defamation was not whether it was "true" but whether true or not, did defamation of the plaintiff occur? I acknowledge that time change and Common Law alters with precedence but in both Privacy and defamation I submit that the previous employer traduced both tenets.

*Comment by Campbell — 30 January 2008 @ 10:37 pm*

RSS feed for comments on this post.

Leave a comment

Name (required)

Email (will not be published) (required)

Website

[ ] I have read and accepted the Terms and Conditions.

[ Post Comment ]



Advertisement

**Recent Comments**

John Jones
If this was a 'bald' woman then I think you would find a different outcome. You say we have got rid ...

Smoker
Need a cigarette after reading this...

CO
I work in a large office, where it seems to be somebody's birthday everyday, so birthdays aren't rea...

brew
In a matter of the sales industry, if two candidates applied 1: Body like baywatch, great smile 2 ye...

China
How do I get one of those?! hilarious, thanks ASH!

**Sponsored Links**


Click here to find Nessie and you could win a trip for two to Larnach Castle in Dunedin.


From 1 April, your employer will begin paying 1% of what you earn to your KiwiSaver scheme. Click for details


Check out our latest KOTI Deals here

Home | News | Sport | Business | Entertainment | Lifestyle | Travel | Tech | Newspapers | Magazines

Site Map | About Stuff | Feedback | Advertise Online With Us | Place a Newspaper Classified Ad | A to Z directories | Magazine Subscriptions | Competitions | RSS

© Fairfax New Zealand Limited 2007. All the material on this page has the protection of international copyright. All rights reserved


Wondering if you've received a fair offer?


Want ammo to negotiate your salary?


Want info on benefits at potential employers?


VAULT
www.vault.com
Vault Salary Surveys


TELL US WHAT YOU THINK

# ABOVE THE LAW

Please Log In or Join Now    Add RSS

Keyword Search

 Search

Big Law, Crime, Bonuses, Bad Ideas, Law Schools, Roundtable, Vote

## Musical Chairs: Kasowitz Attributes IP Head's Departure to 'Extremely Inappropriate Personal Conduct'

*Tuesday, January 22, 2008 1:35 PM - By David Lat*

If we hadn't already named a Lawyer of the Day, the prize might have gone to Jeremy Pitcock of Morgan & Finnegan. From the American Lawyer:



The former head of intellectual property at Kasowitz, Benson, Torres & Friedman was fired in December for "extremely inappropriate personal conduct," according to the firm.

Not merely "inappropriate" conduct, but "extremely inappropriate" conduct. We're guessing it was strenuously objectionable.

Jeremy Pitcock, 35, joined Kasowitz in March 2006 after being wooed from Simpson Thacher & Bartlett, where he was a senior associate. Kasowitz named him head of IP not long after. But after less than two years, Pitcock left the 200-plus-lawyer firm for 52-lawyer New York IP boutique Morgan & Finnegan.

Morgan touted Pitcock's hiring as "an outstanding addition to our successful litigation practice" when it announced his move on January 8. But the Kasowitz firm says he was forced out following an unspecified incident.

"Mr. Pitcock was terminated for cause by Kasowitz, Benson in December 2007 because of extremely inappropriate personal conduct," name partner Daniel Benson said in a statement.

So what prompted the firm's statement?

Kasowitz's statement followed the publication of an article in trade publication IP Law 360 last week, which reported that Morgan had lured Pitcock from Kasowitz. In his statement, directed toward the publication, Benson said, "It was inaccurate to use 'nab' in your headline, or to use 'jump ship' in your opening paragraph."

"We were not looking to publicize this incident, but because of those incorrect news items, we felt compelled to set the record straight," Benson said in a press release that the firm distributed online.

We're stingued -- and the full article in the American Lawyer doesn't offer much more. If you have details on the alleged conduct, please email us. Thanks.

Kasowitz Fired its ex-IP Chief for Inappropriate Conduct [The American Lawyer via Law.com]
Jeremy S. Pitcock bio [Morgan & Finnegan]

Recommend This    Email    Link To          (47) Comments

*Posted in Intellectual Property, Kasowitz Benson, Litigators, Morgan & Finnegan, Musical Chairs, Simpson Thacher, Vicious Infighting*

SUBSCRIBE
Enter your email address and start enjoying Above The Law today!

Enter Email Address

Subscribe

## COMMENTS



Posted by guest | Permalink
Tuesday, January 22, 2008 1:40 PM

I heard he was caught refreshing ATL over and over again so that he could be the one
to post
FIRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRRSTAH



Posted by Jeremy Pitcock | Permalink
Tuesday, January 22, 2008 1:47 PM

what's inappropriate about bringing a MILF mag into the mens' room?



Posted by Anonymous | Permalink
Tuesday, January 22, 2008 1:51 PM

If things don't work out at Morgan Finnegan, maybe Jeremy "S.Pitcock" could join
Harness, Dickey and Pierce.



Posted by guest | Permalink
Tuesday, January 22, 2008 1:54 PM

What happened to Mr. Pitcock?

Anyone in the cockpit with info?



Posted by guest | Permalink
Tuesday, January 22, 2008 2:00 PM

Fired for conduct in December 2007?

Since when is diddling a paralegal at the holiday office party considered "extremely
inappropriate personal conduct"? I though that being able to do the freak-nasty with
people at the office party was one of the many perks of being the head of a division.



Posted by wgwag | Permalink
Tuesday, January 22, 2008 2:00 PM

Nothing inappropriate here.



Posted by guest | Permalink
Tuesday, January 22, 2008 2:01 PM

may be he pulled a costanza: "I had sex with your wife!"



Posted by guest | Permalink
Tuesday, January 22, 2008 2:04 PM

Interesting...can't wait to hear what homeskillet did.



Posted by Anonymous | Permalink
Tuesday, January 22, 2008 2:08 PM

Something tells me it was likely in line with his oft-reprised role as misogynist: e.g. as a
student at MIT, he was part of a group of "counter-protestors" who attended a rally
against sexual harassment and stood at the back of the assembly holding up a placard
reading "She Wanted It".

Source: http://www.mit.edu/activities/safe/cases/mit-srulkarbiiran/protest-rally

Must be fun having that as the first hit when you google your own name.



Posted by google er | Permalink
Tuesday, January 22, 2008 2 10 PM

At least he's consistent, if it was sexual that is.

"Jeremy S. Pitcock '94, another counterprotester, said that the reason
he got involved in demonstrating at the rally was due to the postering
of Bitran's class on Nov. 16, when a group of students filed into the
back of his classroom holding signs. "I'm for treating sexual
harassment as a real problem, but I think Bitran shouldn't be
harassed. The postering of Bitran's class was completely out of line.
It was a personal affront against him," Pitcock said."

The whole story here.
http://www.mit.edu/activities/safe/cases/mit-erulu.rbitran/protest-rally



Posted by guest | Permalink
Tuesday, January 22  2008 2 14 PM

1:40 post of the day - A+



Posted by Question | Permalink
Tuesday, January 22, 2008 2 35 PM

What did he do? I knew Pitcock as we worked together at a previous shop, and he was a
good guy.



Posted by Poor Info | Permalink
Tuesday, January 22, 2008 2 31 PM

I am curious what happened here.

I knew him from STB, brilliant patent litigator, shoe-in for pship at STB, but they asked
him to wait another year, so he bolted for Kasowitz, who made a lucrative offer. Prior to
that, he bragged about always having equity offers starting in his 6th year as an STB
associate.

He was always abrasive, and on his second marriage I believe, but never knew him to
be the guy who would do anything inappropriate.

We need those details, please!



Posted by guest | Permalink
Tuesday, January 22, 2008 2 33 PM

sounds like sour grapes at Kasowitz. They better watch out for a defamation suit.



Posted by guest | Permalink
Tuesday, January 22, 2008 2 41 PM

ah yes, "nab" and "jump ship" are fighting words if I've ever heard any.

perhaps the "extremely inappropriate" conduct was leaving the firm.



Posted by Grover Cleveland | Permalink
Tuesday, January 22, 2008 2 42 PM

Based on that daguerreotype, it appears the misconduct did not involve a moustache
ride.



Posted by guest | Permalink
Tuesday, January 22, 2008 2 50 PM

Wow, sounds like he was a dick at MIT. Ten bucks says he doesn't think he did anything
wrong. Who the hell holds a "don't flatter yourself" sign at a sexual harassment rally?



**Posted by guest | Permalink**
*Tuesday, January 22, 2008 3:20 PM*

[Who the hell holds a "don't flatter yourself" sign at a sexual harassment rally?]

Someone who goes to a school where most of one's classmates are men, and the few women who show up are set upon by packs of roving nerds.

I think there was a saying at Wellesley that, when it comes to MIT, "the odds are good, but the goods are odd."



**Posted by Anonymous | Permalink**
*Tuesday, January 22, 2008 3:25 PM*

To 3:20 -- approx 45% of MIT undergrads are female. This is more than "a few women."

We also had our own sayings about the Wellesley girls, none of which are clean enough to reproduce here...



**Posted by guest | Permalink**
*Tuesday, January 22, 2008 3:27 PM*

"Don't flatter yourself"? Juvenile, in the AA bake sale way, but funny, (in the same way as well).



**Posted by guest | Permalink**
*Tuesday, January 22, 2008 3:34 PM*

3:20, I think you're confusing MIT with Cal Tech, where women are indeed set upon by packs of roving nerds (often on unicycles).



**Posted by Cos... tanza' | Permalink**
*Tuesday, January 22, 2008 4:17 PM*

Probably invoked the Costanza defense utilized when it was discovered he was knockin-da-boots with the Panamanian cleaning lady while at his desk: "Was that wrong?" George replies after being told he's fired for the act. "Should I have not done that? I tell you, I gotta plead ignorance on this thing because if anyone had said anything to me at all when I first started here that that sort of thing was frowned upon ..."



**Posted by guest | Permalink**
*Tuesday, January 22, 2008 4:24 PM*

does anyone know a patent attorney capable of appropriate conduct?

i dont, and im a patent attorney



**Posted by Rush | Permalink**
*Tuesday, January 22, 2008 4:27 PM*

2:50- People fed up with the angry, self-loathing feminazi agenda.

On Point- this guy seems like a dick, so he probably got what he deserved with this.



**Posted by JD | Permalink**
*Tuesday, January 22, 2008 4:33 PM*

I need to quickly register a trademark for the phrase "extremely inappropriate personal conduct."



**Posted by anon | Permalink**
*Tuesday, January 22, 2008 4:53 PM*

Case 1:08-cv-05166-JES Document 1 Filed 06/05/2008 Page 80 of 82

Another brilliant business decision by M&F.



Posted by guest | Permalink
Tuesday, January 22, 2008 5:04 PM

Move along. Nothing to see here.



Posted by Anonymous | Permalink
Tuesday, January 22, 2008 5:13 PM

LOL@"People fed up with the angry, self-loathing feminazi agenda."

Oh my god, you actually said "FEMINAZI"! You used a "word" coined by Rush Limbaugh in semi-serious conversation! Bwahahaha!



Posted by JD | Permalink
Tuesday, January 22 2008 5:13 PM

We should shorten the line to read "Extremely I.P. Conduct"



Posted by 5 13 | Permalink
Tuesday, January 22 2008 5:46 PM

ATL comments are not a semi-serious conversation.

Also, semi-serious conversations usually don't include "LOL" or "Bwahahaha!"

HTH



Posted by guest | Permalink
Tuesday, January 22, 2008 5:47 PM

Kasowitz has had little success in building an IP practice. Anyone remember when Salem Katsh came over from Shearman? I hear that Katsh was shooed out for inappropriate conduct as well. Inside information on that would be appreciated as well...



Posted by Anonyguy | Permalink
Tuesday January 22, 2008 6:14 PM

I wonder what the real name was before they changed it.



Posted by guest | Permalink
Tuesday January 22, 2008 6:28 PM

Does use of "feminazi" count towards Godwin's law? If so, I call the first DING DING DING DING!!



Posted by guest | Permalink
Tuesday January 22, 2008 10:21 PM

DETAILS DETAILS DETAILS

Dorky MIT Patent Litigator + Trying to Build a Practice = Long Hours and pres in a conference room.

Bottom line, don't set the "spin" machine to high when you get canned from Kasowitz, because they will toss you to the wolves.

And another angle - who was asleep at the switch for this NOT to have come out when he was searching around for a new job? Shouldn't someone have gotten just a little suspicious when this apparently highly-recruited nerd-all-star ran from the group he was supposed to be founding? Within what, 2 years? Anyone?



Posted by guest | Permalink
Tuesday, January 22, 2008 10:29 PM

excellent point 10:21, but not as good as 4:30 :)



Posted by Anonymous | Permalink
Tuesday January 22 2008 10:32 PM

Re 10:21

It must have been more than that.



Posted by Magloveth | Permalink
Wednesday, January 23 2008 1 50 AM

MIT's gender ratio has changed dramatically in the last 15 years. In the mid-nineties it was 70-30, and by the late nineties it was 60-40. However it always been true that everyone there is equal. The men are men, and the women are men too.



Posted by guest | Permalink
Wednesday, January 23 2008 10 19 AM

What's the deal with Kasowitz anyway? What is their reputation?



Posted by guest | Permalink
Wednesday, January 23 2008 10 41 AM

They're a profitable litigation shop. They value prestige and most of their lawyers are highly credentialed.



Posted by guest | Permalink
Wednesday, January 23 2008 10:57 AM

Dan Weiser would disapprove...



Posted by guest | Permalink
Wednesday, January 23 2008 11 05 AM

I don't know about prestige, but I've heard about their litigation and bankruptcy groups being total a-holes. Two good friends have dealt with them (separately), and both had stories that would make your head spin - denying typical "professional courtesy" requests, discovery disputes on every issue, etc. I also heard they use their in house PI firm to search through your client's garbage (I think I read that one in an online story somewhere). I googled them, and there are some good stories about them getting smacked around severely in the DNJ for some really, really, really shady practices - something involving the use of a document filed under seal in one action to start another action. I also remember a posting (perhaps on this fine blog?) talking about how Mr. Kasowitz himself unceremoniously threw a low-level associate under the bus for that late "mistake" during his testimony before the DJ (i.e., "it's not my fault, that stupid associate didn't tell me that document was filed under seal and I wasn't allowed to use it to file my lawsuit.") That's just classy, and paints a picture that is pretty consistent with their little press-release about Mr. Pitcock. I need to know what he did or else I'm going to start feeling bad for him.



Posted by Anonymous | Permalink
Wednesday January 23, 2008 2 15 PM

I don't feel bad for that Pitcock guy. I hear that he was a huge jerk even before he got to Kasowitz.



Posted by 14thyearsteve | Permalink
Wednesday January 23, 2008 5.35 PM

"Kasowitz Benson"??

Case 1:08-cv-05166-JES Document 1 Filed 06/05/2008 Page 82 of 82

Never heard of em. What tier firm are they? Certainly lower, yes? What kind of bonil do they pay?

14thyearslave



Posted by guest | Permalink
Thursday January 24, 2008 5:41 PM
I think they have the highest profit per partner stat right now - $1.5 million.



Posted by cockfighter | Permalink
Saturday January 26, 2008 1:49 PM
There's a "rumor" that Benson was sloshed when he issued the press release and they're now quaking in their boots at Kasowitz. Seems like there are a lot of potential causes of action here. Maybe Benson will be the next partner to be fired for "extremely inappropriate personal conduct." Maybe Pitcock can refer Benson to his lawyer.



Posted by If Life is Just a Bowl of Cherries, What am I Doing in the Pits | Permalink
Friday, February 8, 2008 11:53 AM
I just heard Jeremy was fired from Morgan & Finnegan two days ago - he no longer appears on their website.



Posted by Anonymous | Permalink
Tuesday February 12 2008 1:50 PM
Not surprised. He was inappropriate with a friend at STB.

## POST YOUR COMMENTS

Comment as a guest or sign in below to comment

Username

Password

Submit